UNITED STATES, Appellee

v

FRANK K. CAREY, Second Lieutenant,
U. S. Air Force, Appellant

11 USCMA 443, 29 CMR 259

*Lieutenant Colonel Philip J. Williamson* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel James L. Kilgore.*

*Lieutenant Colonel Francis R. Coogan* argued the cause for Appellee, United States. With him on the brief was *Colonel John F. Hannigan.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused, who was described as a "very outstanding" enlisted man, a "distinguished graduate" of Officer Candidate School, and the "best student" in the officer's electronics course at Keesler Air Force Base, Mississippi, was tried and convicted for a ten-day unauthorized absence from the electronics school. He was sentenced to forfeiture of all pay and allowances and dismissal from the service. The sentence was approved by the convening authority and a board of review. We granted review to consider whether the evidence is sufficient as a matter of law to support the finding that the accused was legally sane at the time of the commission of the offense.

Before turning to the merits of the issue, it is appropriate to mark out the general limits of the evidence that we can consider. A conviction must stand or fall on the evidence admitted at trial. Recourse cannot be had to matters outside the record of trial to remove a reasonable doubt that may be left by the evidence presented at trial. United States v Duffy, 3 USCMA 20, 11 CMR 20; see also United States v Schick, 6 USCMA 493, 20 CMR 209. True, the issue of sanity is given a "preferred rating" in military law, in that the question can be raised at later stages of the case, but the preference is for the benefit of the accused, not the Government. United States v Burns, 2 USCMA 400, 9 CMR 30; United States v Schick, supra. Thus, paragraph 124 of the Manual for Courts-Martial, United States, 1951, provides that if it appears "from the record of trial or otherwise" that further inquiry into the accused's mental condition is appropriate, a reviewing authority may direct that such inquiry be made "regardless of whether any such question [insanity] was raised at the trial or how it was determined if raised." If insanity is raised and litigated at the trial, the Government cannot support the findings of guilty with evidence available before trial which it did not present, or with evidence obtained after the trial.

Here, the prosecution's case in chief consisted of morning report entries showing the initiation and voluntary termination of the period of unauthorized absence. In defense, the accused maintained that at the time of the commission of the offense his mental state was such that, while he could distinguish right from wrong, he could not adhere to the right. To support the defense, he introduced expert and lay testimony bearing upon his mental condition.

The defense showed that the accused had first served as a noncommissioned officer. During a tour of duty in 1954 in French Morocco, he was with the Fourth Radio Relay Squadron. He was considered to be a "very conscientious NCO"; quiet and "serious about the moral aspects of life." It also appears that in 1958 he was selected for, and graduated from, Officer Candidate School and commissioned a Second Lieutenant. About July 1958, he was assigned to the 3380th Technical School, Keesler Air Force Base, for a fifty-one week course in electronics.

At school the accused was regarded by his classmates as the best student in the class. On the basis of in-class and out-of-class associations, Major R. P. Eberle, the class leader, was of the opinion that the accused's "character is . . . the highest . . . [he had] ever observed"; he said if he had a thousand officers from which to choose those to serve under him, the accused would be his "number one choice." The accused moved ahead of his regular class, and completed the course in about "half the time." While with his regular class, on his own volition, the accused helped other members who had difficulty in understanding the assigned material. The accused "impressed" Captain H. C. Alm, Jr., one of the members of the original class, as being of "very high moral standing."

On November 28, 1958, the accused went absent without leave. He remained away until December 10. Captain Olive, who knew the accused as an enlisted man in Africa, "was shocked" when he learned of the accused's absence. He believed the accused "must have been under extreme stress." Captain Alm was also "shocked" when he learned of the incident, "as [was] the rest of the class." Major Eberle was "completely shaken up" because the act was "foreign" to his "thinking of the way he [the accused] was." Neither Captain Alm nor Major Eberle had noticed any "perceptible change" in the accused's attitude in their associations with him and he did not appear to them to be under stress. However, two civilian psychiatrists, testifying for the accused, said that at the time of his unauthorized absence the accused suffered from an acute dissociative reaction which so affected his capacity for rational judgment that he could not adhere to the right.

Dr. Charles D. Myers testified by deposition. He said he graduated from Louisiana State University Medical School in June 1945. Since March 1951, he was engaged exclusively in the practice of psychiatry and was certified as a specialist in that field by the American Board of Psychiatry and Neurology. He examined the accused on March 17, 1959, for about one hour. On the basis of his examination, he was of the opinion that, at the time of the offense, the accused suffered from an acute dissociative reaction. During the course thereof the accused had no capacity for rational judgment and was subject to an "overwhelming desire" to escape from the situation in which he found himself. As a result, while the accused knew it was "wrong to go AWOL," he was "powerless to control his flight." In Dr. Myers opinion, if the accused had been restrained from leaving it was "likely" he would have developed a fugue state or amnesia or a "catatonic reaction."[1] According to Dr. Myers, the situation from which the accused was compelled to escape was this:

"9th Interrogatory: . . . in your opinion how did this behavior of his . . . come about?

"Answer: In order to answer this I think is it important that I review some of the history as given by this man which, briefly, is I believe somewhat as follows: We have here a young man of apparently a rather rigid, driving ambitious personality structure, who had been under a great deal of strain for a long period of time, both in his training program

---

[1] In the course of Dr. Myers' testimony, he was asked about two opinions given by Colonel L. E. Gatto, Senior Consultant in Psychiatry, Keesler Air Base Hospital. In his first opinion, which was given in his examination during the Article 32 investigation, Colonel Gatto said the accused *could not* adhere to the right by reason of conflicts and motivations within him at the time of the offense. In his second opinion, which was contained in a certificate filed in conjunction with two other military doctors, Colonel Gatto said the accused's "ability to adhere to the right is considered to have been *partially* impaired." (Emphasis supplied.) These opinions were not admitted in evidence on the merits, and the law officer specifically instructed the court members they were not to be considered "for the purpose of establishing the truth of the matters asserted therein," but only as part of the questioning of Dr. Myers.

and in his family life. I refer to his wife's illness and her departure from Biloxi. Following this he engaged in some behavior which was definitely contrary and completely at variance to his own moral code. I think as a result of the guilt which he felt and the realization that he had violated his own rather strict moral codes, he became panic stricken on the morning in question. His capacity for rational judgement [sic] left him, and for a period of some six to eight days he was in this state which is described as an acute dissociative reaction."

Dr. G. T. Sheffield also testified for the defense. He was a medical doctor with experience in neuropsychiatry since 1922. In 1946 he was certified by the American Board of Psychiatry. Among positions he held in the course of his medical career was that of Chief, Neuropsychiatric Service, Veterans' Hospital, Biloxi, Mississippi. Additionally, Dr. Sheffield very frequently testified in criminal cases and in veterans' competency proceedings. He examined the accused on two separate occasions. On the basis of his examination, and data provided by the base psychiatrist, which was of "immeasurable help," he concluded the accused suffered from a dissociative reaction during which he "was trying to run from himself." The reaction is an "impelling force" and the accused "could not control his actions." The accused's intelligence was not an offsetting circumstances, and if the accused had been stopped from going absent without leave, he "might have had a complete break with reality." Dr. Sheffield explained his diagnosis as follows:

"You take an individual that was reared in rather strict religious surroundings and has high ideals, is very conscientious or, you might say, the overconscientious type of individual, and then for him to work very hard trying to accomplish his course—as I understand it, he was trying to put a 52 week course into 24 weeks—well, now, he probably was plenty tired from a mental standpoint, and we don't always realize how tired our minds become. All right—that, plus the fact that he evidently did some dreaming when he was playing the piano, because he was trying to get release from tension. This happened several days before he went AWOL—if I may be permitted to say that. And then because of the distance he was going, to play the piano, he elected to play in a bar which was nearby; then he drank some liquor, which he never had been accustomed to doing and which was unusual; then his relationships—supposed relationships—with a girl, which was absolutely foreign to his nature, and all contrary to his conscience. Now, speaking of conscience, or like some of us might say, his judge or super-ego—you know I'm trying to couch this thing in language we'll all understand—you see that was so traumatic to him until he just couldn't take it, and of course it's really amazing to me he didn't develop a frank psychotic episode, but apparently it was just a dissociative thing, which was a partial separation of his mind, or splitting of it; so he just couldn't take it, and it was flight."

Testifying on the characteristics of the dissociative reaction, Dr. Sheffield said that a break in the pattern of conduct is "usually" sudden, but the "precipitating factors may be gradual." He also said he did not think that lay persons associated with the accused during the course of the reaction would recognize the accused's mental condition.

To rebut the defense medical testimony, the Government introduced no medical evidence of its own; instead, it called Eleanor Marie Davis. She was the woman whose relationship with the accused, according to the defense psychiatrists, precipitated the accused's dissociative reaction. She testified she was married, but indicated she was not living with her husband and she used the "Miss" form of address. She was employed as a barmaid. She first met the accused on November 15 or 18, 1958. That evening he drove her to Louisiana. On the

following Saturday, he picked her up in Louisiana and returned her to Biloxi, Mississippi. Every night thereafter they "saw each other." The accused told her he had been married, but that his wife had died; his two children were with his mother. The accused did not know that Miss Davis was married. A day or so before the offense, the accused "said something" about "going AWOL," but she "didn't think no more of it" until "right before" the accused met her on November 28 and told her he was absent without authority. "[A]ll of a sudden" they "just left."

The accused said that he was going to go to Michigan, but Miss Davis preferred California. To satisfy her, they agreed on California. According to Miss Davis, it did not seem to make any difference to the accused where he went. They were "going to go out there and get married." Apparently, on November 28 the accused took his Oldsmobile car to a place "back of Popps Ferry" and parked it there; he then purchased a 1950 Plymouth. The accused told the witness he "didn't want them to catch him before be got out of the State." The accused also bought a "set of rings" and gave it to Miss Davis when they left. En route to California, Miss Davis disclosed that she was married. She and the accused talked about a divorce for her, but "there wasn't no further plans made of it" and "no more was said about it." Arriving in California, they went to Long Beach and Los Angeles. The accused looked for and found employment. At first he used another name but then he "gave them the correct one." The accused worked for one day. When he returned that evening, Miss Davis suggested they return to Mississippi "and he said, all right, and so . . . [they] packed up and came back." The return trip took about three or four days with the accused doing most of the driving. There was very little conversation by the accused and Miss Davis. As she said, "he didn't hardly talk." Asked if there was anything "wrong" the accused replied, " 'The less I talk the better things will be.' "

About two weeks after their return to Biloxi, Miss Davis telephoned the accused at the base, and learned that he was in the psychiatric ward of the base hospital. She succeeded in reaching him by telephone at the hospital. He told her "they thought something was wrong with him." He told her about his wife and attributed his earlier representation that she was dead to the fact he was "mixed up." The final part of Miss Davis' testimony, important to the issue before us, is the following question and answer.

"Q. Marie, the time that you knew him before you left on this trip for California, and while on this trip, in your observation of him were his actions any different on the two different occasions comparing them with each other?

"A. No, not as I can say. They were all the same. He was the same when I first met him and went on the trip as any other time."

Guilt must be established by the Government beyond a reasonable doubt. The Government's burden extends not only to the elements of the offense charged, but also to the sanity of the accused. In the absence of evidence raising a question of the accused's mental capacity, the Government can rely upon the common experience of mankind that most men are sane. United States v Biesak, 3 USCMA 714, 14 CMR 132. But if evidence is introduced which raises the issue of insanity, the accused's mental responsibility must be proved beyond a reasonable doubt. United States v Burns, supra. If the evidence of sanity offered by the Government is not sufficiently probative to show beyond a reasonable doubt that the accused was sane at the time of the commission of the offense, an appellate court is bound to set aside the findings of guilty. Fielding v United States, 251 F2d 878 (CA DC Cir) (1957); Wright v United States, 250 F2d 4 (CA DC Cir) (1957). Appellate defense counsel maintain that on the basis of the evidence presented at the trial, reasonable minds

cannot escape a reasonable doubt as to the accused's sanity. In substance, they contend the conduct of the accused during his association with Miss Davis was so incongruous with his normal behavior that it fits precisely into the complusive behavior pattern described by the defense psychiatrists and that the two factors, conduct and psychiatric evaluation, "inevitably raise a doubt of sanity."

Peculiarities of conduct are not necessarily indicative of a state of mind which absolves a person from responsibility for his criminal acts. Also, it must be remembered that a person may be mentally ill from a medical standpoint, but still have sufficient mental capacity to be legally responsible for acts in violation of the penal law. The mere fact a person engages in conduct which is foreign to the image of him held by his family and friends does not necessarily point to a mental defect of a kind which makes him legally unaccountable for the act. The embezzler, for example, is ofttimes a paragon of virtue in his community. Here, however, there is evidence of more than a difference in conduct. Two experts on the operations of the mind, whose qualifications were conceded by the Government, testified that the accused's conduct was the result of a mental disease and that he could not adhere to the right. Their testimony was uncontradicted. If credited, the testimony goes further than raising a reasonable doubt of the accused's sanity; it would, in fact, establish that he was not legally accountable for his act. United States v Smith, 5 USCMA 314, 17 CMR 314; United States v Kunak, 5 USCMA 346, 17 CMR 346.

Psychiatry is not an exact science and psychiatrists differ in their opinions on the existence or the extent of certain aberrations in a particular individual. United States v Schick, supra; United States v Dunnahoe, 6 USCMA 745, 21 CMR 67; Holloway v United States, 148 F2d 665 (CA DC Cir) (1945). However, the testimony of a medical expert which is not impeached or discredited cannot be arbitrarily disregarded. Wirz v Wirz, 96 Cal App 2d 171, 214 P2d 839, 843. In fact, the Manual for Courts-Martial, United States, 1951, indicates that the testimony of the medical expert "may be given greater weight than that of a lay witness." Paragraph 122c, Manual for Courts-Martial, United States, 1951, page 203. In the *Dunnahoe* case we pointed out that, especially for the purpose of drawing the line between psychoneurotic disorder and a personality disorder, "courts must rely on the expert witness." The question, then, is whether the record contains evidence sufficient to support the court-martial's finding of sanity, despite the testimony of Drs. Myers and Sheffield.

The fact that the medical testimony for the defense is not contradicted by other medical testimony on behalf of the prosecution does not necessarily mean reasonable men must entertain a reasonable doubt as to the accused's sanity. A finding of guilty, which includes a finding of sanity contrary to expert opinion, can be sustained if it is supported by substantial evidence. Holloway v United States, supra; United States v Gundelfinger, 102 F Supp 177 (WD Pa) (1952); see also United States v Burns, supra. The opinion of a psychiatrist on the medical aspects of the accused's mental condition does not define the scope of the responsibility of the court-martial. The court must consider all the evidence, assigning to each item the weight to which it is entitled. In some instances, the opinion of the medical expert that the accused is mentally incompetent may not be outweighed by the other evidence of sanity. Thus, in Fielding v United States, supra, the Court of Appeals for the District of Columbia set aside the accused's conviction on the ground that the Government had failed to prove the accused's sanity beyond a reasonable doubt. There, as here, the only medical testimony as to the accused's mental condition was introduced by the defense. However, the two psychiatrists that

testified for the accused did so on the "basis of their examination of appellant under hospital conditions over a long period," while the lay testimony presented by the Government came from police officers, who merely arrested and questioned the accused on the day of the offense, and from persons related to the accused who "were out of touch with appellant . . . until just before" the offense. In other cases, the opinion of the expert may be so materially weakened by his own omissions or by other circumstances as to justify the triers of facts in giving little weight to the opinion. United States v Gundelfinger, supra.

Dr. Myers testified that part of the accused's history, upon which he based his opinion that the accused was unable to adhere to the right, included the fact that the accused "had been under a great deal of strain for a long period of time, both in his training program [extending from Officer Candidate School to the electronics course] and in his family life." Dr. Sheffield, however, maintained he did not think "there was anything wrong with . . . [the accused's] home life"; he said the accused was "probably" overworked and worried about the illness of the accused wife and daughter, and these circumstances had "some bearing" on the situation. He indicated the two things "threw" the accused were, first, the fact that he "never drank" before the incident, and, second, the nature of his relationship with Miss Davis, "which he had never done before." Thus, Dr. Myers' opinion was materially affected by the lesser importance Dr. Sheffield attached to the accused's work and family relations. Dr. Myers and Dr. Sheffield disagreed as to the time of the onset of the dissociative reaction. Dr. Sheffield believed it occurred when the accused played the piano at a bar, which was at the beginning of the period of the accused's association with Miss Davis; whereas, Dr. Myers testified the accused became "panic stricken on the morning in question [November 28]." Also, it appears Dr. Sheffield's opinion was subject to a substantial limitation. As extensive

450

as was his background in psychiatry, he did not recall whether he had ever previously seen this "exact type of case." He had to do some reading on the subject, "because you don't see these cases every day."

Besides the differences between, and limitations of, the medical opinions, the doctors' testimony is contradicted by substantial lay testimony by persons who were in a position to observe the accused over a considerable period of time. Major Eberle and Captain Alm attended class with the accused for ten weeks. According to their testimony, the accused handled the course material without any difficulty and he showed no sign of being under stress as a result of his school work. Further, there is no evidence the accused was not "accustomed" to liquor before the offense, which was the one of the two circumstances strongly relied upon by Dr. Sheffield in his conclusion that the accused could not adhere to the right. Miss Davis was with the accused before the dissociative reaction. She was with him a great deal of time during the dissociation reaction and immediately after he, in Dr. Sheffield's words, "came to out in California"; during all that time the accused's actions "were all the same." True, on the return ride from California she was moved to ask the accused what was "wrong," but she did so only because he was not very talkative. His disinclination to talk is fully explained by his answer, namely, that the "less" he said "the better things will be."

Considering all the evidence, in our opinion, the court-martial could find, notwithstanding the medical testimony, that the accused could, beyond a reasonable doubt, adhere to the right. As the Court of Appeals for the District of Columbia said in the *Holloway* case, supra, page 667.

"A complete reconciliation between the medical tests of insanity and the moral tests of criminal responsibility is impossible. The purposes are different; the assumptions behind the two standards are differ-

ent. For that reason the principal function of a psychiatrist who testifies on the mental state of an abnormal offender is to inform the jury of the character of his mental disease. The psychiatrist's moral judgment reached on the basis of his observations is relevant. But it cannot bind the jury except within broad limits. To command respect criminal law must not offend against the common belief that men who talk rationally are in most cases morally responsible for what they do."

The decision of the board of review is affirmed.

Judge LATIMER concurs in the result.

FERGUSON, Judge (dissenting):

I dissent.

I do not believe that I overstate the case when I declare that our affirmance of the findings of guilty in face of the psychiatric evidence in this record effectively destroys, from a factual standpoint, the value of expert medical testimony on behalf of an accused. On many occasions, we have relied upon the statments of psychiatrists in determining that there was sufficient evidence of accused's mental responsibility. Now that the shoe is on the other foot, however, we discount its value by expressing our confidence in the medical expertise of a barmaid. Cf. United States v Richards, 10 USCMA 475, 28 CMR 41. Surely, psychiatry has advanced to the point in which we can more safely stand upon the opinions of those who are trained to detect mental health deficiencies rather than those whose experience is directed toward affording companionship to lonely males. If it has not, I suggest that the legal defense of insanity is no more than a shibboleth which we should forthrightly abandon.

Of course, the contrary is true, and we have reapeatedly recognized it. United States v Burns, 2 USCMA 400, 9 CMR 30; United States v Schick, 6 USCMA 493, 20 CMR 209; United States v Dunnahoe, 6 USCMA 745, 21 CMR 67. It is only our method of dealing with the problem which reduces the impact of this soundly conceived doctrine to a minimal protection. I suggest that the better approach accords to those educated and trained as psychiatrists the benefit of their background and experience, leaving the Government to produce contrary evidence from the wealth of mental experts freely available to it.

The accused was found guilty of absence without leave and sentenced to dismissal from the service, and forfeiture of all pay and allowances. Intermediate appellate authorities affirmed, and we granted review on the issue whether the evidence was sufficient to sustain the finding, implied in the verdict of guilty, that accused was mentally responsible for his delict.

After several years of service as an enlisted man, the accused entered Officer Candidate School. He graduated with distinction and was selected for advanced electronics training at Keesler Air Force Base, Mississippi. He so devoted himself to his studies and possessed such an excellent .technical background that he managed rapidly to move ahead of his fellow students. Indeed, he was expected to complete the normal fifty-two week course in twenty-four weeks. Lieutenant Carey was also noted for his assistance of his fellow students, his religious nature, and his high moral character.

Shortly before the commission of his offense, the accused's wife became seriously ill and returned with their children to her home. Stating to examining pyschiatrists that he had become extremely depressed and tense as a result of the pressure of his studies and the absence of his wife, Lieutenant Carey sought relief by visiting various local bars and playing the piano. Around November 15, 1958, he met Marie Davis, a barmaid in one of the establishments which he had begun to frequent. He told her that his wife was dead. In a few days, they became intimate, and he mentioned "something" about absenting himself without authority. On November 27, he hid his automobile in a nearby wooded area, having purchased another car in order that he might get out of Mis-

sissippi without being apprehended. On November 28, he informed Miss Davis they were leaving and gave her a ring. The accused desired to go to Michigan. However, Miss Davis prevailed upon him to drive to California. En route, she advised him she possessed a living, undivorced husband and that legal action would be required in order to legitimize their relationship.

Upon arriving in California, the accused rented an apartment and sought employment under an assumed name. He was at once successful, although he changed his identification to his correct name when he reported for work. After working one day, the accused returned to the apartment. He and Miss Davis decided to come back to Mississippi in order for him to surrender to Air Force authorities. On the return trip, he was uncommunicative and said to Miss Davis, " 'The less I talk the better things will be.' "

Following his surrender and while hospitalized, the accused, during a telephone conversation, for the first time informed Miss Davis that his wife was living. The entire episode occurred between approximately November 15, 1958, and December 8, 1958. Accused was scheduled to graduate from his course in December 1958.

The prosecution's case consisted of two morning reports establishing the inception of accused's absence without leave on November 28, and its termination on December 8, 1958. Thereafter, the defense presented the deposition of Dr. Charles Dixon Meyers, an experienced psychiatrist and diplomate of the American Board of Psychiatry and Neurology. Dr. Meyers examined the accused for approximately one hour on March 17, 1959, and formed the opinion he was, at the time of his offense, suffering from a mental disease known as an "acute dissociative reaction" which completely prevented him from adhering to the right. The sum of his testimony is contained in the following excerpts from his deposition:

"8th Interrogatory: What is meant by an acute dissociative reaction?

"Answer: This is a term which is used to describe a situation in which a person enters a state in which he loses, to a greater or lesser degree, his capacity to form judgements [sic], and may, in some cases, lose his identity, his memory and, in general, his behavior is controlled by subconscious drives rather than by his conscious judgement [sic].

"9th Interrogatory: With regard to Lt. Carey's case, in your opinion how did this behavior of his, which was controlled by his subconscious, come about?

"Answer: In order to answer this I think it is important that I review some of the history as given by this man which, briefly, is I believe somewhat as follows: We have here a young man of apparently a rather rigid, driving ambitious personality structure, who had been under a great deal of strain for a long period of time, both in his training program and in his family life. I refer here to his wife's illness and her departure from Biloxi. Following this he engaged in some behavior which was definitely contrary and completely at variance to his own moral code. I think as a result of the guilt which he felt and the realization that he had violated his own rather strict moral codes, he became panic stricken on the morning in question. His capacity for rational judgement [sic] left him, and for a period of some six to eight days he was in this state which is described as an acute dissociative reaction.

"10th Interrogatory: By the number of days, you mean the duration of the alleged absence without proper authority, do you not?

"Answer: I think this dissociative probably began to resolve itself at the time he more or less woke to his surroundings, realized that he had again violated his code, and I think he [sic] behavior at that time was rather typical of the high morale [sic] standards he sets for himself. He immediately turned himself in and proceeded immediately back to his post on Keesler Field.

452

"11th Interrogatory: Based on this psychiatric diagnosis in your considered opinion could Lt Carey at the time of the inception of this alleged absence without proper authority from Keesler, could he at that time distinguish right from wrong?

"Answer: I think this is a question that cannot in fairness be answered with a simple yes or no answer. However, I can state that to a person in an acute dissociative reaction the concept of right and wrong has no importance. By that I mean behavior in this state, as mentioned previously, is determined by unconscious factors, and the rational judgement [sic] or that portion of the personality that concerns itself with right and wrong is simply not operating.

"12th Interrogatory: In your psychiatric opinion, would it be consistent to term Lt Carey's condition at that time as a dissociative reaction and still maintain that his ability to adhere to the right was only impartially impaired?

"Answer: In my opinion that's a contradiction.

"13th Interrogatory: Why, Sir?

"Answer: I think by definition as I outlined above, the question of right and wrong simply has no meaning to a person in a dissociative reaction. I might amplify that if you would like me to.

"14th Interrogatory: Certainly.

"Answer: Typically in a dissociative reaction there is one overwhelming desire, usually one of flight from a situation and all other considerations are subordinate to this one desire.

"15th Interrogatory: By this you mean when a person typically in a dissociative reaction is confronted with inner conflicts or stresses his first impulse is to extricate himself from this situation?

"Answer: Yes, that is correct, but his method of extricating himself is not always what he logically would do if his rational faculties were intact. By that I mean the methods that a person in a dissociative reaction would use to extricate himself from his difficulties frequently are completely irrational, and typically are completely at variance with his previous personality.

"16th Interrogatory: Based on your diagnosis then, *I believe it is true that your psychiatric opinion is that at the time of this alleged absence that the accused—that is, Lt Carey, could not adhere to the right, is that correct?*

"Answer: *That is correct.*

. . . . .

"18th cross-interrogatory: Would this have happened even if the accused knew that he would have been immediately detected or apprehended?

"Answer: *I think—this question, of course, is a matter of opinion again. I think he would have made some gesture at flight regardless of the consequences.*

"19th cross-interrogatory: I believe that in answer to one of my earlier questions you stated that if Lt Carey had been asked at the time if he was going absent without leave was wrong he would have agreed that it was wrong?

"Answer: *Consciously he knew that was wrong, but he was powerless to act on the basis of this conviction.*

. . . . .

"22nd cross-interrogatory: *So, knowing it was wrong, and powerless to evaluate the consequences of it, he was not able to do what was right at the time?*

"Answer: *That is my opinion.*

. . . . .

"24th cross-interrogatory: I will re-word it. *Was this inability to adhere to the right a total inability or a partial inability?*

"Answer: *I think I would have to say that it was a temporary total inability.*

**453**

"25th cross-interrogatory: Now that was from a short time before the alleged absence without leave until the termination of the absence without leave?

"Answer: Yes." [Emphasis supplied.]

In rebuttal, the prosecution presented the testimony of Miss Davis. She recounted the occurrence of the events set forth above, and only one question and answer was put to her by trial counsel concerning accused's state:

"Q Marie, the time that you knew him before you left on this trip for California, and while on this trip, in your observation of him were his actions any different on the two different occasions comparing them with each other?
"A No, not as I can say. They were all the same. He was the same when I first met him and went on the trip as any other time."

On cross-examination, Miss Davis made, however, a significant observation:

"Q Did it seem to make any difference to him where he went?
"A I don't know whether it did or not, but it seemed not to.
"Q If you had said you wanted to go to New York he would have gone?
"A I guess, from the way it seemed like, yes, sir.
"Q In other words, it appeared to you he just wanted to get out of here. He didn't care where he went?
"A It didn't much matter from the way I understand it."

Miss Davis also indicated that accused behaved entirely differently on the return trip.

In response to the prosecution's rebuttal witness, the defense adduced the testimony of several character witnesses who established accused's conscientious attention to duty and expressed their shock at the contrast between his prior behavior and that which formed the basis of the charge

against him. The witnesses also indicated accused appeared to be happy with his assignment and he did not exhibit symptoms of strain. The defense then concluded its case with the testimony of the second psychiatrist.

Dr. Gettis T. Sheffield, also a diplomate of the American Board of Psychiatry and Neurology, testified he had been engaged in the practice of psychiatry since 1922. During his career, he had been extensively associated with various state hospitals and the Veterans' Administration. His last official position was that of Chief, Neuropsychiatric Service, Veterans' Administration, Biloxi, Mississippi. Since 1952, he had engaged in private practice.

Dr. Sheffield spent several hours in examining accused and had available to him the history and other data gathered by the Air Force base psychiatrists. He expressed the view that accused, at the time of his offense, suffered from an acute dissociative reaction which rendered him unable to adhere to the right with respect to the act charged. He characterized accused's condition in the following language:

"A You take an individual that was reared in rather strict religious surroundings and has high ideals, is very conscientious or, you might say, the overconscientious type individual, and then for him to work very hard trying to accomplish his course—as I understand it, he was trying to put a 52 week course into 24 weeks—well, now, he probably was plenty tired from a mental standpoint, and we don't always realize how tired our minds become. All right—that, plus the fact that he evidently did some dreaming when he was playing the piano, because he was trying to get release from tension. This happened several days before he went AWOL —if I may be permitted to say that. And then because of the distance he was going, to play the piano, he elected to play in a bar which was nearby; then he drank some liquor, which he never had been accus-

tomed to doing and which was unusual; then his relationships—supposed relationships—with a girl, which was absolutely foreign to his nature, and all contrary to his conscience. Now, speaking of conscience, or like some of us might say, his judge or super-ego—you know I'm trying to couch this thing in language we'll all understand—you see that was so traumatic to him until he just couldn't take it, and of course it's really amazing to me he didn't develop a frank psychotic episode, but apparently it was just a dissociative thing, which was a partial separation of his mind, or splitting of it; so he just couldn't take it, and it was flight.

"Q Doctor Sheffield, was there any other inner stress or motivation with regard to his home life which, in your opinion, may have compelled him to extricate himself from his situation?

"A I don't think there was anything wrong with his home life, except his wife was away and sick, and so was his little girl—she had pneumonia—so of course there was stress but I don't think there was any actual difficulty in the relationship there.

"Q I didn't mean to imply that, sir. Doctor, in your psychiatric opinion, as a result of this diagnosis and the result of your education and background, do you have an opinion as to whether in fact the accused at the time of this alleged offense could distinguish right from wrong?

"A Well, I don't think he could. *I think this was an impelling force; he just had to get away from there. Regardless of what would happen to him or what anyone said, I think the same thing would have happened to him.* I don't think he particularly planned to go to California, I think he might have planned to go to Michigan. He was trying to run from himself, which of course we can't do.

"Q *Would you term this an irresistible impulse?*

"A *Yes.*

"Q In your psychiatric opinion,

adhering to the right has no consequence here?

"A No, I don't think he ever stopped to think about what was right or wrong at that time.

"Q Would you term dissociative reaction a disease?

"A Yes." [Emphasis supplied.]

Of particular importance is the following testimony:

"Q Doctor Sheffield, if a lay witness were to come in contact with a person approximately ten days before a dissociative reaction were to fall upon that person, and that observer did not know the party suffering from the dissociative reaction before that ten days, in your psychiatric opinion could that observer identify the manifestations or, indeed, dissociative reaction as such?

"A No, I don't think so."

My brothers and I are apparently in agreement on the test to be applied in measuring the sufficiency of the evidence to establish accused's mental responsibility. Fielding v United States, 251 F 2d 878 (CA DC Cir) (1957); Wright v United States, 250 F 2d 4 (CA DC Cir) (1957); Hopkins v United States, 275 F 2d 155 (CA DC Cir) (1959); United States v Oakley, 11 USCMA 187, 29 CMR 3. The question to which we must address ourselves is whether the proof of responsibility at the time of the commission of the offense is sufficient to establish that fact like any other, beyond a reasonable doubt. United States v Lyons, 11 USCMA 68, 28 CMR 292; United States v Brand, 10 USCMA 437, 28 CMR 3; United States v O'Neal, 1 USCMA 138, 2 CMR 44. In this case, however, they find a basis upon which the court members could have predicated a finding of responsibility, whereas I am certain that the record is so devoid of proof of sanity that " 'a reasonable mind must necessarily have had a reasonable doubt.' " United States v Oakley, supra, at page 191.

The evidence, as depicted in the principal opinion and separately set forth herein, paints a factual picture

**455**

of a young, brilliant, overconscientious, and religiously oriented officer whose amoral entanglement and contemporaneous absence without leave so shocked his confreres that explanation for his delict seemingly must be found in a disordered mind. That impression is solidly borne out by the entirely consistent testimony of both Dr. Meyers and Dr. Sheffield. I find nothing in the record to contradict their opinions and, contrary to the arguments of the Chief Judge, I can establish no reason for the rejection by the finders of fact of their apparently credible testimony.

The principal opinion bases its conclusion of evidentiary sufficiency in this area upon:

a. Asserted differences between the testimony of the two defense experts;

b. A "substantial limitation" on Dr. Sheffield's opinion;

c. Failure of accused to show signs of stress during class attendance; and

d. Miss Davis' characterization of accused as "all the same." Taking up these factors *seriatim*, it is clear that they can afford no foundation for the court-martial's verdict.

Initially, I must note that I am unable to discover any material inconsistency between the testimony of the two experts. True it is that Dr. Meyers referred to accused's "family life" as a causative factor in the disintegration of his personality, while Dr. Sheffield stated his belief that there was nothing wrong with accused's "home life." The statements, however, are not in conflict. Dr. Meyers was referring to the absence of accused's wife and child during a critical period. A stabilizing influence was not present when it was most needed. Dr. Sheffield's testimony, considered in context, was *to the same effect:*

"Q Doctor Sheffield, was there any other inner stress or motivation *with regard to his home life* which, in your opinion, may have compelled him to extricate himself from his situation?

"A I don't think there was anything wrong with his home life, *except his wife was away and sick, and so was his little girl—she had pneumonia—*so of course there was stress but I don't think there was any actual difficulty in the relationship there." [Emphasis supplied.]

Nor is there any divergence of viewpoint between the two doctors concerning the onset of accused's illness. Dr. Meyers testified that accused's disease led him to suffer from a temporary total inability to adhere to the right "from a short time before the alleged absence without leave until the termination of the absence without leave." Dr. Sheffield made the following statement concerning the same point:

"Q When did this reaction first begin, from the facts and story that Lieutenant Carey gave?

"A I have an idea *he began to slip back* when he started playing the piano all afternoon. That's merely an opinion." [Emphasis supplied]

Consideration of this testimony in light of the other declarations of the witness set forth, supra, leads inevitably to the conclusion that Dr. Sheffield and Dr. Meyers were discussing two entirely different subjects when asked for their respective opinions concerning the time accused became ill. It is obvious that Dr. Meyers thought accused became irresponsible shortly before he went absent without leave. It is equally apparent that Dr. Sheffield's answer was addressed not to the question of responsibility, but to the time at which accused's mind began to degenerate.

It is next urged that Dr. Sheffield's opinion is "subject to a substantial limitation," for he did not recall previously seeing "this exact type of case" and had to do "some reading on the subject." Dr. Sheffield's exact language was:

"Q *Have you ever testified before* with regard to dissociative reaction?

"A *I don't know whether I've had the exact type of case or not.* This

is a little bit different to most of them. I don't think I've been in a court-martial before except under GO-45, in connection with World War I, and I don't know whether you remember GO-45 or not.

. . . . .

"Q Do you think you could have arrived at an opinion with only an hour consultation?

"A Well, you might arrive at an opinion. Actually, the longer you have to study the thing out the better your opinion will be. *Of course I had to do some reading along that line because you don't see these cases every day, and I have a library I refer to in order to make sure my opinion is correct, and I tried to be as near accurate as I knew how.*" [Emphasis supplied.]

Certainly, no weight should be detracted from Dr. Sheffield's testimony simply because he had not frequently appeared before courts-martial with respect to a defense of insanity bottomed upon the existence of a dissociative reaction. Indeed, both the medical and the legal professions have deplored the professional psychiatric witness who makes a business of appearing in court. It is equally ridiculous to state that Dr. Sheffield's opinion was substantially limited because he made reference to his library in order to assure himself of the accuracy of his impressions. To the contrary, his testimony reflects no more than the professional investigation to be expected of a highly competent specialist who desired that his diagnosis be patently correct prior to his appearance before the court-martial. Such being the case, I am sure Dr. Sheffield's consultation of his library in reality offers small comfort to those who would affirm the findings.

The author of the principal opinion also attributes significance to the failure of accused's classmates to detect signs of stress during his attendance of the electronics course. It is apparent that this fact was of interest to the members of the court-martial, for they specifically inquired of Dr.

Sheffield concerning the apparent lack of overt symptoms of mental disease. His reply bears repetition here:

"Q Some of the witnesses indicated there was no perceptible change in his attitude. His grades were still high. They couldn't notice any change or difference at all in his make-up. Then all of a sudden he takes off in flight.

"A This thing was probably building up inside and wasn't visible. People come to me and say, 'Doctor, I'm awfully nervous,' but they look all right to me. It's inside. They're not trembling or anything like that."

In like manner, Dr. Sheffield made it clear that accused's break with the realities of his military career would not have been apparent to Miss Davis, whose association with the accused commenced only after he began to "slip." At the time he commenced his liaison with her, his personality was already disintegrating. Her relation that accused appeared to be the "same" during the entire episode corroborates the testimony of the physicians that he was irresponsible during the entire period. Moreover, she pointed out that he acted differently on his return trip from California, for he talked very little and indicated that the less he said, the better it would be. Once more, this tends to establish the accuracy of the psychiatrists' opinions, for they were of the view accused had then regained his faculties—an impression consonant with coolness towards his recent paramour.

In sum, every factor relied upon by the author of the principal opinion was involved in the testimony of the two expert witnesses. Their joint opinion that the accused was unable to adhere to the right with respect to the act charged took into consideration the accused's failure openly to display the stresses playing upon him. The only witness questioned on the subject pointed out that a dissociative reaction was not readily perceptible to the lay observer. These trained, eminent psychiatrists never

457

varied from the conclusion that accused was not responsible for his unauthorized absence. Neither made reference to "moral judgment" or any other inadmissible test. Rather, both referred expressly to the standard applied in military law and measured accused's mental state by its demands. Under the circumstances, I prefer not to substitute my judgment for their more expertly conceived views, and I can find no valid reason for the rejection of their testimony by the court-martial.

I do not mean at all to assert that expert psychiatric testimony must in every case be rebutted by the Government or else this Court should conclude that, as a matter of law, the evidence of mental responsibility is insufficient. See United States v Oakley, supra. When, however, the record is devoid of any evidence permitting an inference of sanity, and reliable expert testimony is permitted by the Government to stand unrebutted and unimpeached, it is clear to me that, as here, a case exists in which reasonable men are not entitled arbitrarily to find the accused sane. Nor is there anything novel in this approach. In Hopkins v United States, supra, three psychiatrists testified that the defendant was schizophrenic. Relatives related a history of abnormal behavior. Two physicians, testifying as "laymen," stated that defendant appeared "sane," "of sound mind," and "lucid and rational." In reversing and remanding, the Court of Appeals remarked pertinently:

". . . In the present case the evidence of insanity was plainly substantial. It understates the matter to say that in our opinion all the evidence did not permit the trier of the fact to conclude beyond a reasonable doubt that appellant had no mental disease or defect. We by no means suggest that lay testimony may not, in some circumstances, be reasonbly thought so far to outweigh psychiatric testimony as to prove sanity beyond a reasonable doubt. We deal only with the circumstances before us.

"For purposes of comparison, we suggest a hypothesis. Suppose the question were, as it sometimes is in an abortion prosecution, whether the woman was pregnant; three gynecologists, each of whom examined her professionally for the purpose of determining whether she was pregnant, testified positively that she was not; two psychiatrists, each of whom talked with her but neither of whom examined her, testified, expressly 'as laymen', that she looked pregnant to them; and several laymen testified to similar effect. It would hardly be contended that the prosecution could be thought to have proved pregnancy beyond a reasonable doubt." [United States v Hopkins, supra, at pages 5 and 6.]

And in Douglas v United States, 239 F 2d 52 (CA DC Cir) (1956), the same Court remarked, at page 59:

". . . We find it impossible to hold in the face of the generally uniform testimony of the three disinterested psychiatrists, the only ones who testified, that this test essential to the validity of the verdicts was met. On any rational view of this evidence, emanating from Government sources, reasonable doubt existed as to Douglas' sanity. . . .

"True, there was non-expert testimony. But this, as will be seen from its outline earlier in this opinion, cut both ways, at least as deeply in the direction of insanity as of sanity. Our judicial conclusion that as a factual matter a reasonable doubt was created by the disinterested medical testimony, coupled with the adjudication of unsoundness of mind and the hospitalization for eighteen months, is not changed by the lay witnesses who testified only as to Douglas' conduct during the robberies and shortly thereafter."

See also Satterwhite v United States, 267 F 2d 675 (CA DC Cir) (1959), and Fielding v United States, 251 F 2d 878 (CA DC Cir) (1957).

In my opinion, the foregoing author-

ities are soundly reasoned. We live in an age of specialization, and nowhere is particularized knowledge more important than in the area of measuring an individual's mental capacity. When, as in this case, the record of trial depicts only circumstances which are entirely consistent with the psychiatric testimony and, indeed, strongly support the experts' opinion, a classic case of lack of responsibility is made out. If the Government refuses to assume its burden, despite the availability to it of unlimited facilities, we should not hesitate to accord to the testimony of the distinguished witnesses for the defense the weight which it deserves. When that is done in this case, it is apparent that a reasonable person must have a reasonable doubt concerning accused's responsibility for the offense charged. Hopkins v United States, supra; Douglas v United States, supra. Indeed, those cases involved lay testimony of responsibility. As I have heretofore pointed out, this record is bare of any foundation for a finding of responsibility.

In sum, I am of the opinion that, in face of the expert testimony here present, there is no basis for an inference of mental responsibility in accused's case. I have outlined the insubstantial character of the grounds upon which the Chief Judge relies in expressing a contrary view. If there was ever a case in which the Government failed to sustain its burden, it is set forth in this record, and when we affirm the findings reached by the court-martial, we reduce the defense of insanity at the time of the offense to an absurdity. Accordingly, I must dissent.

I would reverse the decision of the board of review and order the Charge and its specification dismissed.