UNITED STATES, Appellee

v

ARTHUR JOHN MORRIS, Steward Apprentice,
U. S. Navy, Appellant

20 USCMA 446, 43 CMR 286

No. 23,473

April 2, 1971

*Lieutenant Kenneth F. Ripple*, JAGC, USNR, argued the cause for Appellant, Accused. With him on the brief was *Second Lieutenant Dennis E. Codlin*, USMCR.

*Lieutenant Thomas J. Donegan, Jr.*, JAGC, USNR, argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Charles J. Keever*, USMC, and *Commander Michael F. Fasanaro, Jr.*, JAGC, USNR.

## Opinion of the Court

FERGUSON, Judge:

The accused was convicted of one specification each of robbery, assault with a dangerous weapon, and being absent without leave, in violation of Articles 122, 128, and 86, Uniform Code of Military Justice, 10 USC §§ 922, 928, and 886, respectively. His

sentence to a bad-conduct discharge, total forfeitures, confinement at hard labor for two years, and reduction to the grade of E–1, has remained unchanged through appellate review to this level. One member of the Court of Military Review would have reversed the accused's conviction of robbery and assault with a dangerous weapon (Charges I and II) and ordered the charges dismissed, on the ground that the prosecution failed to meet its burden when the question of insanity was raised.

We granted review on two assigned issues. In light of our holding in this case, we need only consider the single question of:

Whether the evidence of record is legally sufficient to support the convictions under Charges I and II.

The facts of the case are not disputed, defense counsel relying, as he announced he would at the outset of trial, on the defense of insanity. The Government's entire case consisted of the testimony of the two victims of the charged offenses, Lieutenant (junior grade) Mary A. Buck[1] and Lieutenant (junior grade) Mary Ann Small. The offenses occurred on base in the Bachelor Officers Quarters, Naval Training Center, San Diego, California.

At about 10:15 p.m., on July 7, 1969, as Lieutenant Small entered the darkened living room of the quarters of Lieutenant Buck, the accused emerged from behind the door, placed one arm around her shoulder, and held a knife at her throat. He then maneuvered her into the lighted bedroom where Lieutenant Buck was standing, apparently unaware, until that moment, of his presence. The accused asked the two women if they had any money and Lieutenant Buck reached into her purse and handed him two dollars. He then ordered Lieutenant Buck to remove her clothing. When she did not comply, he repeated the

order. At this point, Lieutenant Small suggested that they go to her room where she had a check which she would endorse over to him. The accused rejected the suggestion about the check, arguing that if he took the check he could be traced. Eventually agreeing to leave with Lieutenant Small, he first checked to determine whether there was a telephone in the quarters. When the accused and Lieutenant Small left Lieutenant Buck's quarters, he warned her not to follow or interfere. They walked down the passageway, passing the staircase to Lieutenant Small's room and turned down another passageway, which terminated at a set of stairs. At the end of this passageway, Lieutenant Small broke from the accused's hold, turned and faced him and said:

". . . 'Wait a minute, this is a ridiculous situation. You don't mean to be doing this to us, do you? You haven't hurt us yet; and if you leave us now, then it will be just as if it had never happened.' He said —he asked me if I was a Christian. I said, 'I believe so.' He said, 'Do you swear to God that you will not tell on me?' And I swore, and he still did not make any moves to go or to drop the knife or to do anything to me at that point. He stood there, looking remorseful. I repeated my argument and added that he could not go away with the knife because he might hurt someone and he might hurt himself. He then, still looking remorseful with his head bent down, reached into his pocket and handed me some bills. I believe the bills he took from Mary. I accepted them from him, said, 'Thank you' and smiled and kissed him on the left cheek and said 'Goodbye.' And at that point he turned to go down the stairway at the same time that I turned to go down the passageway to return to Mary's room; but I did not see if he dropped the knife. I did not see him drop the knife at that point."

Lieutenant Buck, in general, corroborated the testimony of Lieutenant Small as to the accused's sudden ap-

---

[1] Lieutenant (junior grade) Buck was an Ensign at the time of the offenses.

pearance in her quarters. She first saw the accused when he was holding a knife to Lieutenant Small's throat. They were then approaching the doorway from the living to the bedroom. When he asked for money, she gave him two dollars from her change purse which was in the desk in the bedroom. She offered him the change but he told her to keep it. When the accused asked about the telephone she told him that she didn't have one. She did nothing when he twice ordered her to remove the pajama outfit she was then wearing. When the accused and Lieutenant Small left her quarters, she secured the door. After putting on some additional clothing, she went to the office and notified the manager.

Lieutenant Commander Koshkarian, a Navy psychiatrist, was the only witness for the defense. His testimony at the trial was extensive, accounting for almost one-half of the record. Doctor Koshkarian testified that at the time of the alleged offense, the accused "was acting upon an impulse," while apparently retaining "some ability to distinguish between right and wrong, he was unable to act upon that judgment." He replied in the affirmative when asked, "Well, is it your conclusion, then, that he was unable at the time to adhere to the right in the sense of that phrase."

According to the psychiatrist, the accused was suffering from "a sexual perversion, which is a type of compulsive neurosis, . . . he was also having a disassociative reaction," at the time of the events in question. His explanation was lengthy. Stripped to its essentials, the psychiatrist's testimony reflected that the accused was, unknowingly, suffering from a form of sexual perversion—fetishism—he received orgastic pleasure from the handling of women's clothing. His request for money was simply an unconscious means of concealing even from himself the true nature of his desire, so that he would not have to face the implications of what he was doing. Doctor Koshkarian testified:

". . . At that time of that event, all he was aware of was that he had had a feeling or a need, an impulse, to go up into a room and take money. At the time he did it, it didn't make sense to him. He didn't need money. There is no background of any previous theft in his background, stealing even minor things, but at the time he had, as I said, the feeling of a need to go up into a room, take money, without an awareness of why. He had some vague sense that it was not right, some sense that perhaps it could even get him in trouble if he were apprehended, but it made no difference. It was like it didn't matter. It was something that would be all right, nobody would really mind, and that is the sense I meant when I said a disassociative reaction, in that one part of his personality, or one part of his function was split off."

Subsequent to these events, the accused allegedly entered some female locker rooms, "going to the clothes, still in his own mind feeling that he was looking for money." When he realized the true nature of his acts, the accused panicked and unlawfully absented himself for twenty-two days. He returned voluntarily and presented himself first to a general medical officer. He asked to see a psychiatrist before actually turning himself in.

On cross-examination by trial counsel, the psychiatrist stated that the accused's act was "an impulse which he had a compulsion to perform, which he tried to fight against. If I recall this was something he thought about for days before he did it, tried to prevent himself from doing it, and finally acted upon it."

In response to questions by the military judge, the witness testified that the accused suffered from a mental illness—an obsessive compulsive neurosis, characterized by a sexual perversion. He reiterated several times his previous testimony that while accused had a "diminished ability" to distinguish right from wrong, with respect to the act charged against him "he was unable to prevent himself from doing

448

it." With regard to whether the accused acted upon an irresistible impulse, Doctor Koshkarian testified:

". . . Yes, I would say he had an irresistible impulse. It didn't necessarily have to come out that particular moment. It could have come out five minutes later. Maybe he could have held it back ten more minutes; or maybe if there was a crowd of people coming, walking down the hallway, he could have postponed it for another half hour, maybe even until the next night. It was an impulse he had to act upon in one form or the other. He might have been able to further displace it on to something else, but the core impulse is something he would have to act upon."

The prosecution presented no testimony, medical or otherwise, in rebuttal to Lieutenant Commander Koshkarian's testimony.

Insanity is an affirmative defense and where reasonably raised by the evidence, its existence is ▆▆▆▆▆▆ ▆ one of fact. When placed in issue, the burden of proof, like every other fact necessary to establish the offense alleged, is always on the prosecution. Paragraph 122a, Manual for Courts-Martial, United States, 1969 (Revised edition); United States v Burns, 2 USCMA 400, 9 CMR 30 (1953); United States v Mathis, 15 USCMA 130, 35 CMR 102 (1964); Davis v United States, 160 US 469, 40 L Ed 499, 16 S Ct 353 (1895). As the Chief Judge, the author of the principal opinion in United States v Carey, 11 USCMA 443, 448, 29 CMR 259 (1960), wrote:

"Guilt must be established by the Government beyond a reasonable doubt. The Government's burden extends not only to the elements of the offense charged, but also to the sanity of the accused. In the absence of evidence raising a question of the accused's mental capacity, the Government can rely upon the common experience of mankind that most men are sane. United States v Biesak, 3 USCMA 714, 14 CMR 132 [1954]. But if evidence is introduced which raises the issue of insanity, the accused's mental responsibility must be proved beyond a reasonable doubt. United States v Burns, supra. *If the evidence of sanity offered by the Government is not sufficiently probative to show beyond a reasonable doubt that the accused was sane at the time of the commission of the offense, an appellate court is bound to set aside the findings of guilty.* Fielding v United States, 251 F2d 878 (CA DC Cir) (1957); Wright v United States, 250 F2d 4 (CA DC Cir) (1957)." [Emphasis supplied.]

In *Carey,* the Government presented no *medical* testimony in rebuttal to that adduced by the defense which raised the issue of sanity. However, because of the introduction of "substantial lay testimony by persons who were in a position to observe the accused over a considerable period of time," the conviction of Carey was affirmed[2] on the ground that "[c]onsidering all the evidence, . . . the court-martial could find, notwithstanding the medical testimony, that the accused could, beyond a reasonable doubt, adhere to the right." (*Id.,* at page 450.)

In the case at bar, the Government's witnesses, Lieutenants Small and Buck, offered nothing even remotely tending to establish the sanity of the accused. Indeed, Doctor Koshkarian emphasized in his testimony that the victims' testimony actually indicated they recognized, at least implicitly, that they were dealing with a psychiatric case.

In Hartford v United States, 362 F2d 63 (CA 9th Cir) (1966), the ac-

---

[2] I dissented in United States v Carey, 11 USCMA 443, 29 CMR 259 (1960), on the ground that despite the lay testimony as to the accused's mental condition, I believed that the Government had failed to sustain its burden of proving the accused sane. Judge Latimer concurred only in the result in *Carey.*

cused was convicted of transmitting obscene matter in the United States mail. The evidence for the Government consisted of the testimony of the recipient of the letter (a nurse), the postal inspector, who interviewed Hartford, and the letter in question. The nurse testified that she knew what a paranoid state was and that she knew the symptoms of such an illness but that she had not observed any bizarre or unusual conduct on the part of Hartford which led her to believe he had such symptoms. The postal inspector testified that Hartford told him he thought the contents of the letter were obscene.

The accused, Hartford, testified and contended he was sane. He wrote this and many other letters to the nurse because she, allegedly, encouraged him in his love for her. Two defense psychiatrists testified to Hartford's long history of hospitalization for psychiatric treatment or evaluation for a paranoia psychosis on the subject of sex. One doctor expressed the opinion Hartford was insane, and the other, that Hartford was unable to distinguish right from wrong as it applied to sending obscene matter through the mail.

In reversing Hartford's conviction and granting a motion for acquittal, the court stated at pages 66 and 67:

"On this record we conclude that reasonable men must necessarily possess a reasonable doubt as to Hartford's sanity at the time he mailed the letter. All of the medical testimony is to the effect that he was insane, in the legal sense, on that date. The testimony was impressive, being given by well-qualified psychiatrists who had examined Hartford and reviewed his history. They gave full explanations of Hartford's symptoms and their significance. The Government produced no medical testimony to the contrary, relying on cross examination of defendant's experts. We find nothing in that cross examination which undermines the specific opinions expressed by the psychiatrists.

"Likewise, we find nothing in the lay testimony of the postal inspector or the registered nurse which could possibly be regarded as undermining that expert testimony. While Hartford testified that he was sane, the overall tenor and content of his testimony strongly supports the appraisal of the medical witnesses. He very obviously continues to suffer from the same psychoses manifested by the same conduct on his part which has plagued him for many years."

The Court of Appeals for the Tenth Circuit reached the same result in Phillips v United States, 311 F2d 204 (CA 10th Cir) (1962), where the accused pleaded not guilty by reason of insanity to a charge of interstate transportation of a stolen motor vehicle. Inquiry by the trial court disclosed that the accused had a long history of mental illness and institutional care, and had been discharged from the Navy about sixteen years previously as a schizophrenic. Witnesses at trial testified relative to this history. The Court of Appeals held that the evidence was sufficient to cast upon the Government the burden of proving criminal responsibility for the offense charged, beyond a reasonable doubt. It noted that the Government offered no evidence, upon any theory, of the defendant's criminal responsibility, simply contenting itself with cross-examination of the defense witnesses.

Although defense counsel at the trial level informed the court that he would assert the Durham test for criminal responsibility (Durham v United States, 214 F2d 862 (CA DC Cir) (1954)),[3] the Court of Appeals, held at page 207:

---

[3] The trial court rejected a defense proffered instruction, in accordance with the Durham test, and presented the issue to the jury in the terms of knowing right from wrong and being able to adhere to the right. (See footnote 2 at 311 F2d, at page 207.)

"Assuming arguendo that the legal test of criminal responsibility is simply whether, at the time of the commission of the act, the defendant knew the difference between right and wrong, we do not think this modicum of testimony sufficient to sustain the burden of proving criminal responsibility for the offense charged. We conclude that the evidence was wholly insufficient to make out a case for the jury."

Cf. Amador Beltran v United States, 302 F2d 48 (CA1st Cir) (1962), and Frigillana v United States, 307 F2d 665, 671 (CA DC Cir) (1962), opinion by Circuit Judge Burger, where the court, applying the burden of proof rule set forth in Davis v United States, supra, stated:

"We hold, therefore, that the government has not sustained its burden of proof and that a directed verdict should have been entered finding the appellant not guilty by reason of insanity."

On the basis of this record, we are of the opinion that there is no basis for an inference of mental responsibility in accused's case. This is not to assert that expert psychiatric testimony must in every case be rebutted by the Government or else this Court should conclude that, as a matter of law, the evidence of mental responsibility is insufficient. See United States v Oakley, 11 USCMA 187, 29 CMR 3 (1960). When, however, the record is devoid of any evidence permitting an inference of sanity, and reliable expert testimony is permitted by the Government to stand unrebutted and unimpeached, it is clear that, as here, a case exists in which reasonable men are not entitled arbitrarily to find the accused sane. See United States v Hopkins, 275 F2d 155 (CA DC Cir) (1959); Douglas v United States, 239 F2d 52 (CA DC Cir) (1956).

We hold, therefore, that the evidence in this case is legally insufficient to support the conviction of the accused under Charges I and II. Paragraph 122a, Manual; Hartford v United States; and United States v Phillips, all supra.

The decision of the Court of Military Review is reversed. Charges I and II and their specifications are ordered dismissed. The record of trial is returned to the Judge Advocate General of the Navy. The Court of Military Review may reassess the sentence on the basis of the remaining finding of guilty (Additional Charge, alleging absence without leave) or a rehearing on sentence may be ordered.

Judge DARDEN concurs.

QUINN, Chief Judge (dissenting):

No useful purpose can be served by distinguishing the cases cited by the majority. On similar facts, other courts have reached a different conclusion. Commonwealth v Francis, 355 Mass 108, 243 NE2d 169 (1969); State v Holt, 22 Utah 2d 109, 449 P2d 119 (1969). The crucial question is whether the evidence in this case supports the trial judge's finding of mental responsibility. In my opinion, it does.

The testimony as to the circumstances of the robbery and separate assault establishes compellingly that the accused was capable of reasoning and of understanding the difference between right and wrong. The defense psychiatrist conceded the accused's mental ability on that point. The question then is whether the accused could adhere to the right. In my opinion, the evidence supports a finding that he could and provides a substantial basis upon which to reject the psychiatrist's opinion as creating a reasonable doubt as a matter of law.

The psychiatrist saw the accused on three occasions, each for one hour. His knowledge of the accused's condition was predicated upon what the accused told him; and there is no evidence that any of the critical matter was independently verified. See United States v Ross, 19 USCMA 51, 55, 41 CMR 51 (1969). However, assuming the truth of information pro-

**451**

vided by the accused, neither it, nor the doctor's evaluation of it, created, as a matter of law, a reasonable doubt that the accused was compelled to resort to robbery and assault because of sexual impulse.

As described by the psychiatrist, the accused was suffering from a "compulsive neurosis" which forced him to look for and fondle female clothing. According to the doctor, this "sexual impulse" manifested itself at age thirteen, when the accused looked through and fondled his mother's clothing; it persisted until he was fifteen, when it "somehow was pushed under the surface" until this incident occurred. At the time of the incident, the accused did not realize that his search through female effects was really a search for female clothing for "sexual gratification," consequently he was compelled "to maintain the facade that he was there for money," and to act the part of a robber. Curiously, the doctor also maintained that the accused's impulse was "not only to get sexual gratification but almost with the hope of being apprehended, in a sense saying, 'I am having difficulty with this conflict, with this impulse, do something.' " If this was the accused's impulse, he definitely did not show it by his conduct; the testimony of his two victims demonstrates a variety of efforts to avoid recognition and apprehension, and the trial judge had ample justification to reject the doctor's opinion as to this point.

The doctor admitted that while the accused suffered from the sexual impulse between the ages of thirteen to fifteen, he apparently never stole even "minor things" in response to the impulse during that period. He admitted the impulse was submerged for years. He admitted that the accused told him of certain conduct after the offenses in issue which would indicate that only a week after the offenses the accused realized that what he "was really after" was not money, but female clothing so that if he had been discovered, as he was on the occasion that led to the present charges, he probably would have fled rather than "carry off the semblance of a robbery." Finally, the doctor admitted that even at the time of the offenses, there was no "specific way" the accused had to respond to discovery of his presence in the victim's room. On the basis of these admissions the trial judge could, in my opinion, reasonably conclude, as he did, that the accused's condition left him free to choose the particular response he wanted. In short, the accused's condition might have led him to the girl's room, but it did not compel him to rob her and assault another. The trial judge examined the doctor at length on the connection between the accused's sexual impulse and the offenses as charged; on the evidence, he was justified in concluding beyond a reasonable doubt that there was no connection between them.

I would affirm the decision of the Court of Military Review.