UNITED STATES, Appellee

v

LYMAN L. RICHARDS, Specialist Third Class,
U. S. Army, Appellant

10 USCMA 475, 28 CMR 41

No. 11,497

Decided June 26, 1959

*First Lieutenant Herbert R. Brown* argued the cause for Appellant, Accused. With him on the brief was *Captain Arnold I. Melnick.*

*First Lieutenant Wade H. Sides, Jr.,* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel James G. McConaughy, Major Thomas J. Nichols, First Lieutenant Avram G. Hammer,* and *First Lieutenant Edward J. Lee.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

### I

The event preceding this tragic af-

476

fair commenced at approximately 6:00 p.m. on the night of August 18, 1957, at an Enlisted Men's Club in Korea. Between that hour and 10:30 p.m.,

the accused had consumed the contents of not more than four bottles of beer. At that time, he left the Club and returned to his barracks where he changed his uniform to a set of fatigue clothing. He informed one of his soldier friends that he was going to kill someone and then departed from the barracks. He proceeded from there to a guard shack near the gate of his unit and, over the protest of the gate guard, obtained a carbine and a magazine of ammunition. He loaded the weapon and started away from the area by walking along the main supply road. The gate guard alerted the sergeant of the guard, who in turn notified the officer of the day. This officer proceeded to the shack and, after ascertaining the facts, moved a short distance up the road where he noticed a soldier with a carbine. By that time the individual, later identified as the accused, had reversed his course and was walking back toward the area. The officer shouted an order to him to return to the company area and surrender his weapon which was slung over the shoulder or carried at port arms. Several members of the company were assembled near the guard shack, and the officer was some ten feet closer to the accused than were they. When the order was given, the accused halted momentarily, raised his weapon and the officer shouted to the soldiers to take cover. The warning was too late for the weapon was fired and the bullet hit the gate guard in the back, severing the spinal cord with a resultant paralysis of the lower part of the body. Immediately after the weapon fired, the accused turned and fled but he was subsequently apprehended by the military police driving a misappropriated vehicle.

As a result of his misconduct, the accused was charged with lifting a weapon against, and willfully disobeying an order of, his superior officer, violations of Article 90, Uniform Code of Military Justice, 10 USC § 890, and assault with intent to commit murder, contrary to Article 134, Uniform Code of Military Justice, 10 USC § 934. He was found guilty of all offenses and sentenced to a dishonorable discharge,

ten years' confinement, and total forfeitures. The findings and sentence were affirmed by a board of review, and the accused petitioned this Court for relief, setting forth certain assignments of error. Attached to his petition was a medical report dated March 3, 1958, which, out of an abundance of caution, caused us to order the record to be returned to a board of review for consideration of accused's mental capacity and responsibility. Pursuant to our mandate, the board of review caused a board of officers to be appointed to determine accused's mental responsibility for the offense and his mental capacity to assist his counsel in his defense at the time of the trial. The board of medical experts concluded the accused was legally sane, was competent to assist his counsel in his own defense, and suffered only from a character disorder which neither impaired his capacity to form a specific intent to kill nor interfered with his ability to identify the officer. One of the medical officers who signed the original psychiatric report furnished his diagnosis to the board of review and while it was at variance with the conclusions of the medical board, he relied principally upon panic as the cause of accused's mental disorder. The board of review found the accused was sane, reaffirmed the findings and sentence, and we granted accused's petition for review to consider the following issues:

(1) Whether the law officer erred in his definition of murder.

(2) Whether he prejudiced the accused by including in his instruction a statement that insanity could be easily feigned.

The facts necessary to a resolution of those issues will be included in the subsequent discussion of each.

II

In his first instructions on the offense of assault with intent to commit murder, the law officer gave the appropriate elements of the offense and then proceeded to define the crime of murder. In this definition, he relied on Article 118(3) of the Code, 10 USC § 918, which defines murder as an un-

lawful killing without justification or excuse when an accused is engaged in an act which is inherently dangerous to others and evinces a wanton disregard of human life. At the completion of his instructions, trial and defense counsel requested an out-of-court hearing, and during the discussion they convinced the law officer that he had used an improper definition for the crime of murder. It was their contention that under our prior decisions the law officer must limit the court-martial to that particular type of murder which is predicated on a specific intent to kill. While that assertion may perhaps be arguable, cf. United States v Woodson, 3 USCMA 372, 375, 12 CMR 128; United States v Barnes, 5 USCMA 792, 794, 19 CMR 88, we need not pass on that question, for the accused was benefited by the action taken. In any event, the law officer concluded that counsel were correct in their assertion, and he thereupon reconvened the court, admonished that his former instruction be disregarded, and submitted the following as a substitute:

"Let the record reflect that a hearing was had out of the hearing of the court, attended by the law officer, trial and defense counsel, and the accused, and the reporter. The hearing will be appended to the record and marked Appellate Exhibit I.

"I have instructed the court previously in the elements concerning the Specification of Charge II. I instruct the court now to disregard those instructions. I will give other instructions. Again, as to the Specification of Charge II, the court is advised that to find the accused guilty of Charge II it must be satisfied by legal and competent evidence beyond a reasonable doubt. That, at the time and place alleged, and in the manner alleged, the accused, without justification or excuse and with unlawful force or violence, did bodily harm to Richard Williams; That, the accused intended to commit murder; and, That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was

of a nature to bring discredit upon the armed forces.

"To define an intent to kill, That at the time of the shooting the accused had a design to kill; That the shooting was without justification or excuse and an unlawful act of the accused as alleged."

It is now asserted by appellate defense counsel that the foregoing instruction was erroneous and prejudicial to the accused. We agree that the instruction is not well phrased and lacks the clarity which should be present in a charge to the court, but we disagree with the contention that it was prejudicially erroneous.

It is contended that the pause between the paragraphs indicated by the record would cause confusion. We do not know whether the law officer paused at that point, but that is of little significance for in both paragraphs he was talking about one particular specification. It is to be noted that the elements of the offense are properly set out in the first paragraph of the instruction, and the second would be accurate had the law officer used the term intent to commit murder rather than the words intent to kill. However, the words are not foreign to each other, and, for reasons which will hereinafter appear, we are certain the court understood that it had to find an intent to kill before it could return a finding of assault with intent to murder.

There was only one specification under Charge II and that alleged:

"In that Specialist Third Class Lyman L Richards, US Army, Company E, 51st Signal Battalion (Corps), did, at Army Post Office 358, on or about 18 August 1957, with intent to commit murder, commit an assault upon Private Richard Williams, Junior, by shooting him in the back with a carbine."

The only person wounded by the firing of the weapon was the named victim, Richard Williams, and the instruction is applicable only to the offense against him. It required that the court-martial must find beyond a rea-

sonable doubt that at the time of the shooting the accused had a design to kill, and it was so hedged in with the first part of the instruction that it would not be reasonably possible for a court member to interpret its provisions to apply to any specification except the one alleging an assault with intent to commit murder. Intent to kill was embraced within the allegations of the offense charged, and none of the other types of murder are mentioned in the instructions. Therefore, regardless of the inaccurate use of words, when the instruction is considered as a whole the court had to find beyond a reasonable doubt, inter alia, the following elements: (a) bodily harm (assault); (b) unlawful force and violence; (c) lack of justification or excuse; (d) a design to kill; and (e) conduct to the discredit of the service or to the prejudice of good order. Those elements meet the minimal requirements of the law.

The trial incidents reflected in the record support our conclusion that the inept use of the word kill was considered of no importance at the trial level. Both counsel for the Government and the accused were satisfied that the instruction as given properly informed the court of the elements of the particular offense. In an out-of-court conference, they had discussed the matter with the law officer, and they were apprised that he intended to give corrective instructions. They heard the amended instruction given in open court and, upon interrogation by the law officer, both indicated satisfaction with the correction. At worst, the instruction lacks preciseness. and, in that situation, if the defense had any reservations about its accuracy, clarification or amplification should have been requested. The absence of any such request lends color to our belief that any deficiency escaped detection and, accordingly, was harmless.

## III

The second issue involves the instruction given by the law officer on the defense of insanity. In setting out the standards for that defense, the law officer included the following statement in his charge:

" . . . In determining this issue of fact, you are entitled to consider the evidence introduced at the trial pertaining to the sanity of the accused in the light of your common sense and your general knowledge of human nature and the ordinary affairs of life. Thus, you may consider that the general experience of mankind is that most people are sane and that insanity may be feigned with ease. This general experience may be taken into account in weighing the evidence pertaining to the issue of the accused's sanity. The burden of proving the sanity of the accused beyond a reasonable doubt, like every other fact necessary to establish the offense charged, is on the prosecution. If, in the light of all the evidence, taking into consideration your general knowledge of human nature and the ordinary affairs of life, you have a reasonable doubt as to the mental responsibility of the accused at the time of the alleged offense, you must find the accused not guilty of that offense."

The particular portion of the instruction to which the accused objects is that which states that ▮ insanity may be feigned easily. Such a statement may be found in our opinion in United States v Biesak, 3 USCMA 714, 721, 14 CMR 132, but without debating its validity, we believe it inadvisable and undesirable to include an exposition on that subject in an instruction. It adds a doubtful and controversial hypothesis to an instruction for no good purpose. However, in the light of this record, the statement is innocuous. At the time of the trial, there was medical testimony that the accused was legally sane at all relevant dates and that his mental condition was the product of a personality or character disorder. Aside from his bizarre conduct, the only other evidence touching on the issue was a statement by the investigating officer that he did not believe the accused was rational because of the nature of the offense and the informa-

tion he had read in a psychiatric report which showed the accused to be legally sane. His statement is not inconsistent with the medical testimony in that the doctor who examined the accused characterized him as suffering from a disorder which the doctor catalogued as a paranoiac personality. Such a disorder might cause the accused to act irrationally, but that does not mean mental responsibility is raised reasonably as an issue. It may well be that the accused shot the victim in a fit of anger or rage or because he was being harassed by others. Those influences might cause one to depart from the normal behavior of sane persons, but there is no testimony in the record that accused was taunted on the night the instant offenses were committed, nor that he became enraged. Accordingly, the evidence is not sufficient to raise the issue of legal insanity either as it might exculpate or raise lesser included offenses. In spite of the absence of evidence to raise the issue, the law officer gave the accused the benefit of an instruction, and he made it certain to the court members that the prosecution must prove accused's sanity beyond a reasonable doubt. In the light of that, the casual statement that insanity might be feigned easily is considered harmless.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.

FERGUSON, Judge (dissenting):

I dissent.

This accused was tried for, and found guilty of, lifting a weapon against his superior officer, willful disobedience of his superior officer, and assault with intent to commit murder, in violation, respectively, of the Uniform Code of Military Justice, Articles 90 and 134, 10 USC §§ 890, 934.

The record shows that the accused was seen by a friend leaving his barracks in Korea after hours. He mumbled to the friend that he was "going out to kill somebody." Thereafter, he went to the guard post at the company gate; secured and loaded a carbine; and proceeded down the main supply route. The company officer of the day was duly summoned and, upon observing the accused on the route, ordered him to return to the area and surrender his weapon. The accused walked toward the officer and, suddenly raising his weapon, fired one round. The missile struck a gate guard in the spine, causing him to suffer serious injuries.

Psychiatric testimony at the ensuing trial indicated that the accused, although classified as a "paranoiac personality," was suffering from no mental defect, disease, or derangement, and was able to distinguish between right and wrong and to adhere to the right on the night in question. On the other hand, the prosecution's expert medical witness admitted on cross-examination that accused's personality defect may have caused him not to adhere to the right on the night in question, although "he should have been able to"; that a paranoiac personality might become psychotic on occasion; that a period "approaching paranoia" could be brought on by emotional stress; but that "A doctor should be able" to distinguish the two aberrations. He concluded with the statement that he was satisfied that accused was merely a "paranoiac personality." Lay witnesses indicated that accused's eyes were staring during the incident; that he had been subjected to considerable teasing concerning his predilection for the company of Korean nationals; and that the pretrial investigating officer questioned accused's responsibility for his acts, although he had seen a psychiatric report indicating accused was sane.

With the evidence in the foregoing posture, the law officer instructed on the elements of the offenses charged and the defenses of insanity and mental capacity to entertain the required knowledge or specific intent. It is the question of the propriety of these instructions which finally brings the case to us, and, as hereinafter indicated, I differ from my brothers' conclusion that the accused was not harmed by their deficiencies.

I

The law officer delineated the guide-

480

posts to the members of the court for the offense of assault with intent to commit murder as follows:

". . . Again, as to the Specification of Charge II, the court is advised that to find the accused guilty of Charge II it must be satisfied by legal and competent evidence beyond a reasonable doubt, That, at the time and place alleged, and in the manner alleged, the accused, without justification or excuse and with unlawful force or violence, did bodily harm to Richard Williams; That, the accused intended to commit murder; and, That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

"To define an intent to kill, That at the time of the shooting the accused had a design to kill; That the shooting was without justification or excuse and an unlawful act of the accused as alleged."

From the very first time the question was raised, this Court has required the term "murder" to be defined to members of the military jury when an assault with intent to commit that crime was charged. Thus, in United States v Williams, 1 USCMA 231, 2 CMR 137, we said:

". . . [T]here was nothing in the specification or the instruction which in any way defined the crime of murder. The latter is a particularly difficult crime to outline and the differences in degrees between murder and manslaughter are sometimes indefinite and difficult to determine. If the accused were charged with murder, no one would contend that all the elements of that crime should not be mentioned. But, too often, the necessity to give the same information is overlooked when the crime is used as a predicate for an assault. *It would appear to be most difficult for members of a court-martial to determine whether or not an accused intended to commit murder without knowing what elements*

*bring into existence that state of mind."* [Emphasis supplied.]

That the *Williams* case continues to have vitality is evidenced by our subsequent reversals for failure to define the term "murder" in United States v Banks, 1 USCMA 479, 4 CMR 71; United States v Avery, 1 USCMA 533, 4 CMR 125; United States v Lookinghorse, 1 USCMA 660, 5 CMR 88; United States v Warren, 2 USCMA 59, 6 CMR 59; and United States v Cooper, 2 USCMA 333, 8 CMR 133.

The majority opinion does not indicate disagreement with the principle of the foregoing cases and I am sure that its author does not intend to overrule these important holdings *sub silentio*. However, compliance therewith is apparently found in the law officer's requirement that accused have an "intent to kill." I cannot bring myself to believe that the court members derived guidance from the muddled statements of the law officer but, assuming that they were able to realign his declarations in some semblance of order, the demand that he define the offense of murder is not yet met. Intent to kill is only one element of one variety of that crime, and he utterly failed to set forth with particularity its other requirements. As that is what we have held he must do and as that is the knowledge which the court-martial must necessarily have in order to determine whether the accused intended to *murder* his victim, I must record my disagreement with the proposition that the instructions on this subject were sufficient.

II

The second issue regarding the law officer's advice involves his statement in instructions on the defense of insanity that "insanity may be feigned with ease." I unreservedly join my brothers in condemning the delivery of this doubtful statement in the form of an instruction to the members of the court. However, I wholly disassociate myself from their belief that its insertion was not prejudicially erroneous. Contrary to their conclusion, I contend

481

that the record does raise an issue concerning accused's mental responsibility.

True it is that an expert witness opined that the accused's psychiatric malady was no more than a personality disorder. However, the positive character of his assertions was considerably weakened on cross-examination, and he indicated that a paranoiac personality might become psychotic on occasion as a result of emotional stress. The accused was shown to have suffered over a period of time the taunts of his comrades and the investigating officer concluded, despite the witness' contrary sanity report, that he was irrational. Indeed, the unmotivated attack on the victim and accused's declaration that he was going to kill "somebody" bespeak his mental instability. Consideration of these factors leads me to the conclusion that, as indicated by the law officer's instructions on the issue, the question of accused's mental responsibility was in issue at the trial. That being so, the ill-chosen phrase concerning the faking of insanity violated two well-settled concepts in the framing of instructions.

In United States v Andis, 2 USCMA 364, 8 CMR 164, we early held that the law officer was empowered to comment on the evidence before the court, so long as he was careful to indicate to the members that his opinions were not binding on them. Cf. United States v Smith, 3 USCMA 25, 11 CMR 25.

Here, however, where the accused's sole defense was predicated on mental responsibility, the court was informed, in connection with a legal presumption of sanity, that irresponsibility was simulated with ease. At no time did the law officer characterize this questionable concept as his opinion, nor did he inform the court members that they were not bound by its terms. Secondly, we have repeatedly pointed out the error inherent in instructing on theories unsupported by the evidence. United States v Hatter, 8 USCMA 186, 23 CMR 410; United States v Holsey, 2 USCMA 554, 10 CMR 52; concurring opinion of Judge Latimer, United States v Cothern, 8 USCMA 158, 23 CMR 382. There is not one scintilla of evidence in this record to indicate that the accused shammed insanity. Thus, the instructional comment was not only not limited to a statement of the judge's opinion, but introduced into the case an element totally foreign to the positions of both the Government and the accused.

The prejudicial effect of the breach of these basic standards of instructional sufficiency is apparent. The accused's only hope in escaping the consequences of his lawless actions lay in an adjudication that he lacked mental responsibility. The law officer's gratuitously inserted comment effectively undercut that defense and placed the question before the court in a grossly unfair light. As he was entitled to have the isssue determined properly, I deem inclusion of the comment necessarily requires reversal.

For the foregoing reasons, I would reverse the board of review and order a rehearing.