UNITED STATES, Appellee

v

PARKER T. LEWIS, JR., Private, U. S. Army, Appellant

14 USCMA 79, 33 CMR 291

No. 16,605

June 21, 1963

*Captain Charles W. Schiesser* argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel Ralph Herrod* and *Captain Robert L. Brosio.*

*Lieutenant Colonel Francis M. Cooper* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Bruce C. Babbitt* and *Captain Joseph M. Livermore.*

## Opinion of the Court

FERGUSON, Judge:

Arraigned and tried before a general court-martial convened by the Commanding General, 4th Armored Division, the accused was found guilty of assault upon a superior commissioned officer, who was then in the execution of his office, and assault consummated by a battery upon a Sergeant Cook, in violation, respectively, of Uniform Code of Military Justice, Articles 90 and 128, 10 USC §§ 890, 928. He was sentenced to dishonorable discharge, forfeiture of all pay and allowances, confinement at hard labor for three years, and reduction to the lowest enlisted grade. The convening authority reduced the period of confinement involved to two years, but otherwise approved the punishment. The board of review affirmed without opinion, and we granted accused's petition on two issues relating to whether the law officer erred prejudicially in failing to instruct the court-martial on the question of accused's mental responsibility and the limited purpose for which certain evidence of prior misconduct was received.

During the late evening hours of June 30, 1962, Parker T. Lewis was returned by military policemen to the orderly room of his organization, located in Ulm, Germany. His identification card, pass, and a written receipt therefor were delivered to the Charge of Quarters, Sergeant Harrell. A Sergeant Hardy and a Sergeant Cook were also present in the orderly room. Lewis began "to shout, rave, that he was downtown on a pass, that the girl he was with called the MPs on him, and as a result the MPs had given him a DR [delinquency report]." Having thus been reported, "he was finished in the company." He declared that "this was his last chance; he went on to say that he was through this time." During this incident, accused suddenly pivoted and struck Sergeant Cook in the face, turned back, and continued his inveighing about the "DR."

In fact, accused had not received a "DR," and the persons in the orderly room attempted to explain that such was the case. Just after he struck Sergeant Cook, Sergeant Hardy managed to push Lewis from the orderly room, after which accused broke away. He

then told Hardy, who was armed with a .45 caliber pistol, "that he [Lewis] was through, that he had disgraced his family, and to shoot him." Accused was normally a good soldier, and Hardy had not observed him act in this manner before. He was, on this night, however, unable to "get through to him" that he had not received a "DR" and was not in any difficulties. Lewis insisted that he should be shot, and if Hardy did not shoot him, "he would go out the gate, go back downtown and really get into trouble."

With this observation, accused left the orderly room and proceeded to walk out the main gate of the military installation. Twice challenged by a gate guard to produce his authority to leave the base, accused made an obscene observation and continued to walk. The Officer of the Day, a Second Lieutenant Sellers, dressed in field uniform, took charge of the situation, walked through the gate after the accused, and tapped him on the shoulder. He and accused scuffled briefly, but Lewis accompanied him back through the gate. Accused was "mumbling" and "said something about going downtown two or three times." Upon being returned to the gate, Lewis attempted to strike Lieutenant Sellers twice, and they grappled with each other. A Sergeant Smith finally seized the accused around the neck and ended his wrestling with Sellers. Both Smith and Sellers repeatedly pointed out to accused that the latter was a commissioned officer. On at least one occasion, accused replied that he did not care who he was.

The gate guards attempted to force accused to enter their orderly room. When they were unsuccessful in accomplishing this feat, Lieutenant Sellers decided to take him back to his barracks. They walked toward the building, and accused, in a drunken manner, kept muttering, " 'Go ahead and give me my 14 days extra duty' or 'my six months and I'll serve it.' " Sellers told him that a general court-martial would be involved " 'if you don't settle down and come with me.' " Accused replied that he was " 'not going to jail' " and grabbed Lieutenant Sellers by the lapels of his field jacket. The parties once

more began to wrestle. Accused swung at Sellers twice and succeeded in striking him in the face and chest. He then turned and ran back toward the gate. Sellers drew his pistol, called upon him to halt three times, and ultimately fired a round into the air. Upon the weapon's discharge, accused dropped to the ground. The journey to the barracks was completed at gunpoint. Accused was retained there until he could be turned over to military police.

The witnesses are in hopeless conflict as to the accused's condition during the foregoing episode. In Sergeant Cook's opinion, he was drunk, and it was "possible he could have been very drunk." According to Sergeant Smith, "he was walking in some kind of funny way, . . . you could tell that maybe he'd had a drink or two; [but] he wasn't drunk, he knew what he was doing, he was aware of what he was doing and where he was going." According to Smith, he had "a far-away look in his eyes" and did not appear to be in his "right mind." Accused could have been "out of his mind or something, sir."

Lieutenant Sellers' driver, a Private First Class Lane, was of the opinion that accused was not acting normally during the incident. Lieutenant Sellers opined that his "emotional condition . . . was very erratic, he appeared to be under the influence of alcohol." Sergeant Hardy testified that Lewis gave no indication of being under the influence of liquor but appeared to be "very angry." Another gate guard, Private First Class Hodges, declared that accused was "pretty well drunk," to the point that, although they were friends, "I didn't think that he recognized me." A third guard, Private First Class Glaser, testified that accused seemed to have been drinking, but did not appear "as being drunk."

Captain Miles D. Miller, duly qualified as an expert in the field of mental responsibility and capacity, testified that the accused was not suffering from any mental disease, defect, or derangement, and possessed the ability both to distinguish right from wrong and to adhere to the right. He based his conclusions upon an examination of the

accused in light of the facts in evidence. In addition, accused made a pretrial statement to him in which he declared that he recalled "drinking heavily" prior to the incident but had no memory of the alleged assaults. In Dr. Miller's opinion, accused's lack of recall was due to his ingestion of alcohol, and his conduct probably resulted from nothing more "than a normal [alcoholic] loss of inhibitions in a person." He further declared that inability to recognize even "close friends" was "quite commonly found in intoxication."

At the conclusion of the trial, the law officer fully instructed the court on the effect of accused's allegedly intoxicated state upon his ability to recognize Lieutenant Sellers as his superior commissioned officer and the lesser included offense of assault and battery, in violation of Code, supra, Article 128, which does not involve the element of knowledge of Sellers' status.

## I

Appellate defense counsel urge that the evidence in this record is sufficient to raise an issue of accused's mental responsibility for the offense with which he is charged and to require the law officer to instruct the court thereon. In so contending, they argue that the accused's irrational actions on the night in question, evidence of a "far-away look" in his eyes, and that he, in the opinion of certain observers, did not appear to be "in his right mind" constitute that degree of proof needed to place his sanity in question. See Davis v United States, 160 US 469, 40 L ed 499, 16 S Ct 353 (1895); United States v Biesak, 3 USCMA 714, 14 CMR 132; United States v Richards, 10 USCMA 475, 28 CMR 41. We disagree, for, in this record, we are unable to find "some evidence" tending reasonably to place accused's lack of mental responsibility in issue. Cf. United States v Black, 12 USCMA 571, 31 CMR 157; United States v Moore, 12 USCMA 696, 31 CMR 282. To the contrary, it is made crystal clear by the transcript that accused suffered from no mental disease, defect, or derangement. Rather, his irrational actions and lack of stability apparently stemmed from intoxication. And the sole expert witness who appeared so viewed it for, on the evidence presented, he found nothing more than "an exaggerated rage reaction while intoxicated."

Irrational actions may have their source in a number of factors. Compare McDonald v United States, 312 F2d 847 (CA DC Cir) (1962); Gray v United States, 319 F2d 725 (CA DC Cir) (1963). When they result from nothing more than drunkenness, the defense of mental responsibility is not placed in issue. Cf. United States v Richards, supra. Rather, the question which must be submitted to the court members is the effect of that state of intoxication upon a particular element of the offense charged. Cf. United States v Oisten, 13 USCMA 656, 33 CMR 188. That is the manner in which all parties to this trial treated accused's condition and, on the state of the record, we are not disposed to permit urging of an entirely different and unsupported theory on appeal. United States v Rowe, 13 USCMA 302, 32 CMR 302.

## II

The second question before us arises from the failure of the law officer to give any limiting instructions to the court-martial concerning their consideration of evidence of certain, uncharged misconduct. The matter arose in the following manner. As noted above, several witnesses testified at length on the difference between accused's ordinary behavior and his conduct on the night in question. During the cross-examination of one such witness, Sergeant Hardy, the trial counsel elicited the following:

"Q. Have you ever seen him mad before, really mad about something?

"A. I don't know—what do you mean by 'really mad'—I've seen him angry, disturbed about an incident.

"Q. Was he visibly disturbed, was he complaining bitterly about anything on this occasion, or was he

very quiet and sullen about his anger—how was he expressing it?

"A. Well, this occurred with another soldier in his squad, if I remember correctly, we had just come in from the field. This soldier was sitting on a bed, Lewis was standing up; they were arguing about something, and then, all at once Lewis just picked him up and hit him about two, three times real fast—and within the next few minutes they were shaking hands.

"Q. So you have observed Lewis in a situation where a flash of anger came over him and then he calmed down quickly again?

"A. That's correct, sir."

A court member evinced interest in this area for, following cross-examination, he engaged in the following exchange with the witness:

"Q. You said Private Lewis at one other time was involved in an incident where he hit the man in his squad?

"A. Right.

"Q. In your opinion, does Private Lewis feel he is a—

"LO: What's that—

"Q. Does Private Lewis feel— or in your opinion, does he attempt to be a fighter?

"LO: I don't believe that's a proper question. I appreciate your motive but I think it's something that probably should be avoided.

"Maj. Wilke: All right, sir.

"Q. The initial, whole incident, when the man came into the orderly room with what he assumed was a DR, he said 'this was my last chance'—

"A. Right, sir.

"Q. Seeing you are in Private Lewis's platoon, has he been a good soldier or has he gotten into difficulties during off-duty times before?

"A. Well he had gotten into difficulties before—that's what they were.

"Q. Well, I don't want to go into that—but there was substance, then, to it?

"A. Right."

The foregoing examination brought before the court-martial evidence of other criminal behavior by the accused which was not charged against him. The failure of the law officer *sua sponte* to limit the court's consideration of these matters to the purpose for which they were admissible was error. United States v Back, 13 USCMA 568, 33 CMR 100; United States v Hoy, 12 USCMA 554, 31 CMR 140; United States v Bryant, 12 USCMA 111, 30 CMR 111. It is necessary, however, to determine whether the omission harmed the accused, for, as we noted in United States v Back, supra, at page 571:

". . . On the one hand, evidence of accused's guilt may be such that the failure to restrict proof of other misconduct may be fairly said to have weighed not at all in connection with the findings and sentence. On the other, the record may present a fair risk that the fact finders accorded weight on the merits to the matter. We cannot lay down any precise measure for answering this subsidiary question, which, of course, depends so much upon the circumstances of the individual case."

The United States, assuming error *arguendo*, urges affirmance on the basis that the proof of accused's guilt is compelling. We do not so view the record. True it is that a number of witnesses testified to the commission of the actual assaults, and there is evidence that accused knew Lieutenant Sellers was his superior commissioned officer. But the state of the proof is not such that the court members were compelled to reach that result. There is also in the transcript proof that the accused was grossly intoxicated. One witness testified that, although they were friends, accused did not seem to recognize him. An expert declared that such lack of cognitive ability due to intoxication was commonly found. Lieutenant Sellers was clad in a field uniform similar to that worn by noncommissioned personnel and his insignia of rank was displayed only on his collar and field

cap. In view of these and the other factors pointing to accused's disorientation, we cannot say it would have been unreasonable for the members to have concluded he did not know Lieutenant Sellers was his superior commissioned officer at the time of the alleged assault. And, permitted to consider the proof of accused's earlier difficulties without restriction, the court may well have decided to reject his defense of intoxication on the basis of his general undesirability as a soldier. United States v Back, supra, at page 572. We find, therefore, that there is present here a fair risk accused was prejudiced by the law officer's omission.

The same consideration does not apply to the charge of assault consummated by a battery upon ▆▆▆▆ ▆ Sergeant Cook or to the same lesser included offense with respect to Lieutenant Sellers, which the law officer very properly submitted to the court-martial. Voluntary intoxication is not a defense to either of these offenses, and the evidence is overwhelming that both were committed. As to them, therefore, there is no fair risk that the court's unlimited consideration of evidence of other misconduct was injurious to the accused's substantial rights. United States v Back, supra; Code, supra, Article 59, 10 USC § 859. Accordingly, we limit our reversive action to Charge I, its specification, and the sentence.

The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Army. The board may affirm the lesser included offense of assault consummated by a battery under Charge I and reassess the sentence on the basis of that offense and Charge II and its specification, or order a rehearing on Charge I, its specification, and the sentence.

Chief Judge QUINN and Judge KILDAY concur.