UNITED STATES, Appellee

v

THOMAS R. BIGGS, Private First Class, U. S. Army, Appellant

22 USCMA 16, 46 CMR 16

No. 25,315

November 17, 1972

Captain Denis E. Hynes argued the cause for Appellant, Accused. With him on the brief were Colonel Arnold I. Melnick and Captain Terrence Ahern.

Captain Ronald A. Cimino argued the cause for Appellee, United States. With him on the brief were Lieutenant Colonel Ronald M. Holdaway, Captain Glenn R. Bonard, Captain Richard L. Menson, and Captain Benjamin P. Fishburne, III.

## Opinion of the Court

QUINN, Judge:

At issue is the sufficiency of the evidence to support the accused's conviction for separate assaults upon commissioned and noncommissioned officers within a period of approximately 30 minutes.

Shortly after termination of a "red alert" against an enemy attack, the accused loaded a M–79 grenade launcher with a high explosive round and went about his troop area pointing the weapon at various persons. Almost every Government witness indicated that the accused's conduct was completely out of character. Captain Frazier, one of the victims, testified that the accused's action was "180 degrees different from what . . . [he] had ever done."

Evidence indicates that the accused had been on "edge" for some time; just before the incident he was "jumping at the slightest noises" and was

apparently "all shook up" at taunting remarks by a Specialist Straughn. While his conduct was not regarded as unusual then, it was dramatically different after he "fell flat on his back" and struck his head "very hard" on a board walkway. Apparently unconscious from the fall, he was carried to bed. In about five minutes, he regained consciousness and movement. His conduct and comments in the next half hour, during which he seized and loaded a M–79 grenade launcher and moved through the area calling persons "gooks," "dinks," and "Viet Cong imposters," and threatening to kill them, led several witnesses to conclude that his mind had "snapped."

To some witnesses it appeared that the accused "didn't recognize anything" or anyone. A noncommissioned officer, who was the victim of one of the assault charges lodged against the accused, testified that the accused "seemed confused more than anything" and he "really couldn't tell everything was happening." On the other hand, the division psychiatrist testified that two days after the episode he had examined the accused. The accused had informed him that he recalled "drinking quite a bit" before the incident, but he "had no actual memory" of the events that resulted in the charges against him. He further testified that the accused exhibited no symptoms of any "mental or neurological illness" and gave no indication that he had suffered a head injury. His testimony can reasonably be construed as indicating that in his opinion the "most likely explanation" for the accused's conduct was that "he had had too much alcohol to drink." Other evidence indicates the accused had been drinking before and after the "red alert."

By appropriate instructions, the trial judge submitted to the court members the question of the accused's mental condition as a defense to all the charges. He also instructed them that, as a matter of law, the accused was innocent of some of the assault charges if he had acted in the belief, however erroneous or unreasonable it might be,

that the victims were "members of the enemy force." On that issue, he admonished the court members to consider the evidence of intoxication, with the "basic question" being whether it raised "a reasonable doubt that he knew the identity" of the victims as his superior officers. With one exception, the court members found the accused guilty as charged.

Appellate defense counsel contend that the evidence does not establish the accused's sanity beyond a reasonable doubt. See United States v Morris, 20 USCMA 446, 449, 43 CMR 286 (1971). They also contend that the sanity question is "closely akin" to the insufficiency of the evidence "to prove beyond a reasonable doubt that the appellant knew" the military status of the persons whom he assaulted. As explicated in their brief, the blow on the head the accused suffered in his fall made him "totally irrational." The same contention was made at trial.

Within minutes after the weapon was taken from the accused, he was examined by Dr. Pearson, the squadron surgeon. His testimony and that of the division psychiatrist fairly support a conclusion that the accused's fall did not have any noticeable physical effect upon him. Other testimony, by witnesses patently sympathetic to the accused, leaves no doubt that, even after the fall, the accused was oriented to persons around him and to the implications of his conduct.

First Sergeant Coffelt testified that he was notified by the Charge of Quarters that the accused was a "little bit wild." At the time of the report, the accused had already left his bed and had procured the M–79. Coffelt went to the accused's area. As he approached, three or four persons ran from the building in which the accused lived; the accused came "right behind them." He had the "79 in his hands . . . broken open." Coffelt asked the accused "what" he was "doing," and enjoined him to "Take it easy." In response, the accused "locked" the weapon, "pointed it" at Coffelt, and "said, '1st

Sergeant, get out of here or I'll kill you.' " As Coffelt took a step forward, the accused repeated his remark. Coffelt "threw up . . . [his] hands," turned, and walked away. Specialist Wile testified that when Warrant Officer Davis came on the scene another officer called out that it was Davis; the accused "turned around and said, 'Oh, yeah, Mr. Davis is O. K.' " Sergeant Dye testified that the accused, armed with the M–79, came up to his "hooch" and ordered him and several others "to get inside there and shut up." Inside he ordered Dye to turn off a light. Dye, who was patently reluctant to testify against the accused, admitted that the accused addressed him as "sergeant."

When the accused was disarmed, he was immediately taken to the orderly room. Specialist Wile testified that there the accused kept "trying to tell everybody he was sorry"; that he "didn't mean to hurt anybody"; and "things like this." Dr. Pearson indicated that when he arrived at the orderly room, the accused knew his name and that when Colonel Molinelli came in somewhat later, the accused remarked: "There's the colonel. I'm in trouble." Similarly, Sergeant Coffelt testified that the accused "knew" the troop commander, Major Gross, when he entered, and that he asked the major what "are they going to do to me." According to Captain Rosenthal, he specifically questioned Major Gross as to whether he was "going to punish" him "for this."

As appellate defense counsel argued, the accused's conduct was bizarre. Unusual, even irrational conduct, however, can be attributed to a "number of factors" other than mental malfunctioning. United States v Lewis, 14 USCMA 79, 82, 33 CMR 291 (1963). Substantial evidence in this record indicates that the accused's conduct could have resulted from intoxication or emotional upset at Specialist Straughn's taunting. We need not decide whether the court-martial concluded that either or both of these factors precipitated the assaults. Suffice it, the record contains ample evidence to support the

court's determination that, at the time of the offenses, the accused was, beyond a reasonable doubt, free of any mental disorder, defect, or derangement. United States v Carey, 11 USCMA 443, 29 CMR 259 (1960). The evidence further supports the court's finding that the accused knew the military identity of the officers he assaulted.

All the assaults of which the accused stands convicted were committed within a brief period of time. Certainly, the offenses are serious, but as one witness testified, the accused could easily have seriously injured all his victims, but he hurt none. The circumstances of the case, both in regard to the accused's condition and in the continuity of the several acts in the total episode, recall the reminder in United States v Cave, 17 USCMA 153, 156, 37 CMR 417 (1967), that "from the standpoint of mitigation, all the wrongs committed by the accused can be regarded as 'just one long transaction.' " At the time of the offenses, the accused was eighteen years of age. Captain Rosenthal, former executive officer of the accused's troop and its commander at the time of trial, described the accused as "normally a softspoken, mild-mannered and well-behaved soldier" whose performance of duty was "excellent." This case, therefore, impresses us as one deserving exacting review of the justice of suspension of the punitive discharge.

The decision of the Court of Military Review is affirmed.

Chief Judge DARDEN concurs.

DUNCAN, Judge (dissenting):

Since I am unable to appraise the sufficiency of the evidence as the majority does, I dissent.

Paragraph 122a, Manual for Courts-Martial, United States, 1969 (Revised edition), requires that an accused's sanity be presumed unless sanity becomes a fact issue upon which the Government has the burden to present sufficient evidence. In United States v Papenheim, 19 USCMA 203, 205, 41 CMR 203 (1970), we said:

"The test to be applied in determining the sufficiency of the evidence is whether there is, in the record, some competent evidence from which the members of the court-martial were entitled to find beyond a reasonable doubt, the existence of every element of the offense charged."

In evaluation of testimony for sufficiency, a reviewing court should afford the prosecution's evidence an assumption of truth together with reasonable inferences that can be drawn from it. If so viewed by the court to be sufficient at law, then whether or not there is reasonable doubt is for the fact finders.

In the case before us the trial judge recognized that the issue of the appellant's sanity was raised by the evidence and that the Government adduced sufficient evidence properly to make sanity a matter for the members of the court-martial to determine. Although I believe the issue of sanity to have been raised, I do not find that the Government sustained its burden to present sufficient evidence of appellant's sanity.

Evidence concerning Bigg's sanity is composed of opinions, both of lay witnesses and medical doctors, and observations of the conduct of the appellant.

Paragraph 122c, Manual, supra, provides:

". . . Although the testimony of an expert on mental disorders as to his observations and opinion with respect to the mental condition of the accused may be given greater weight than that of a lay witness, a lay witness who is acquainted with the accused and who has observed his behavior may testify as to his observations and may also give such an opinion as to the general mental condition of the accused as may be within the bounds of the common experience and means of observation of men."

Holding in mind that the testimony of lay witnesses has probative value on the issue of sanity, an examination of the *Government's* lay testimony indicative of Biggs' conduct and opinions regarding Biggs' sanity follows:

*Specialist Four Keith N. Louis.*

"Q. Did you hear him call anybody a dink or a gook?
"A. Yes, sir, I did.

"Q. Who did he ever call a dink or a gook?
"A. Everybody, sir.

. . . . .

"Q. How did he look at the things in the hooch, around the hooch?
"A. He looked at them as if he had never seen them before or he didn't recognize anything.

. . . . .

"Q. *Did you feel that Private Biggs meant what he said when he referred to you all as gooks?*
"A. *Yes, sir, I did."* [Emphasis supplied.]

*Specialist Five Ronald H. Wile* (Oral Deposition, Prosecution Exhibit 1).

"Q. And then what took place?
"A. We sat there and talked for a little bit like I started to tell you, about him being scared, and Don and I told him that all that was going to kill him over here was his nerves.

"Q. By Don, you mean Spec Four Straughn?
"A. Spec Four Straughn, yes, sir. We told him that all that was going to kill him over here was his nerves, and we told him that he had to calm down and more or less relax, and it wouldn't bother him so much. And, Don told Tom that he had to calm down and all this, and Tom, *something went wrong with him all of a sudden* and Tom just started pushing Don.

"Q. You mean something went wrong with PFC Biggs?
"A. Yes, it did. *Something just snapped in his mind the way it seems* and he just started pushing Specialist Straughn around, saying he wasn't going to die, he wasn't going to die. He pushed him three or

four times down the hall way in our hootch.

. . . . .

"Q. Was his behavior different after he awoke from hitting his head, than before?

"A. Yes, sir.

"Q. Did you say he was pushing Straughn?

"A. Yeah, it was more or less the same, but more violent.

"Q. Has Biggs ever done anything like this before?

"A. No, sir.

"Q. Never got violent before?

"A. No, sir, Tom is a quite easy going guy. He always has been, the whole time he has worked for me." [Emphasis supplied.]

*First Sergeant Garry L. Coffelt.*

"A. . . . I said, 'Take it easy.' At that time he locked—loaded the 79 with a HE round and pointed it at me and then said, '1st Sergeant, get out of here or I'll kill you'. . . .

. . . . .

"Q. After he had been apprehended did you detect any change in his demeanor at that time?

"A. Yes, sir. I don't know. He —he was just incoherent, body was completely flushed as if the person had a sunburn and he would go from recognizing and knowing who we was [sic] to calling us all dinks. *He didn't have any idea who we was [sic] back and forth.*

. . . . .

"Q. What was the nature of that conversation [with Major Gross]?

"A. . . . He mentioned this to Major Gross, 'What are you going to do to me?' Major Gross said, 'Well, we will have to do something.' *Then the next minute he would be off, 'All you dinks are trying to kill me,' again.*

. . . . .

"Q. Do you think he thought that —before the shot do you think he thought that—do you think he thought, you know, he knew who you were?

"A. Well, I'm not really sure, especially after we had him in the orderly room there, and at times he seemed to know who he was talking to and then other times he would look at you and called us all dinks *and he, I believe, thought we was* [sic]." [Emphasis supplied.]

*Private First Class Richard D. Wolf.*

"Q. Are you under the impression that at the time of the incident he was intoxicated?

"A. Well, that is the thing. He just snapped. *His mind just went out on him.*

"Q. Why do you say that?

"A. Well, because he just wasn't himself. His eyes were different and in all he just wasn't himself. When I first came to the troop Tom helped me set up. Well, PFC Biggs helped me to set up all my stuff and all and he's been real good to me since I have been there and—

"Q. From what you observed that night, in your acquaintanceship with him do you have any knowledge why he may have acted that way?

"A. Well, Specialist Straughn kept on saying—just kept on saying to him, 'You're going to die,' and I guess it scared him.

. . . . .

"Q. Did you think he was intoxicated at that time?

"A. It's hard to say. I couldn't really tell you." [Emphasis supplied.]

*Sergeant First Class John D. Dye.*

"Q. You have mentioned that he called a number of people by name. Do you feel that he recognized these people?

"A. Well, sir, he called them by name. Whether he recognized them or not I don't know.

. . . . .

"Q. How would you compare his behavior that night with the impression you have, opinion you have of him from the time you have known him?

"A. *About 180 degrees out of phase.*" [Emphasis supplied.]

*Chief Warrant Officer Leroy C. Davis.*

"Q. Mr. Davis, did PFC Biggs seem to recognize you?
"A. *Not really sure whether he did or not, sir.*" [Emphasis supplied.]

*Lieutenant Stephen D. Merino.*

"Q. How long have you known PFC Biggs?
"A. I have known him since he came in the troop, I believe seven months.

"Q. How would you compare his behavior that night to what you know of him?
"A. It was completely different from the way he usually is."

*Captain Sidney D. Rosenthal.*

"Q. O. K. During this period of time how was his coordination?
"A. Rather alert, I think coordinated, very high-strung and jerky, I'd say would probably be the best way to explain that.

. . . . .

"Q. After jumping him, so to speak, what if anything did PFC Biggs say?
"A. Well, he was very overwrought and loud. He was—the entire time he was screaming, 'Don't let these gook bastards get me. Get these gook bastards out of the area,' things of that nature, virtually the whole time this was his primary train of thought.

. . . . .

"Q. Did he seem to recognize the people around him?
"A. *Not really, no. Not that I recall at the stage he didn't. . . .*

. . . . .

"Q. Did you tell PFC Biggs who Dr. Pearson was?
"A. Yes, yes, I specifically said that.

"Q. Did he recognize Dr. Pearson before you told him that?

. . . . .

"A. No, I don't—I don't think so. We are still back in the room now?

"Q. Yes.
"A. I'd say at that time—at that time it was sort of a refresher course in who Dr. Pearson was. Do you follow me? Dr. Pearson was one of the people milling about in the orderly room who I had already pointed out one time.

. . . . .

"Q. O. K. Now, let's place ourselves back in time at the time when PFC Biggs was in possession of the weapon. What was he calling people at that time?
"A. Imposters, gooks, VC, all of these things, really.

. . . . .

"Q. *Do you think he knew who you were?*
"A. *No, not at that point. I think I had—I think I'd—I think I'd know what he—when he finally* did realize who I was, but not—not—not at the time.

"Q. When do you think he finally realized who you were?
"A. Well, he finally realized who I was when he was down on the floor in the orderly room after the melee, we'll say, was all over with.
. . .

. . . . .

"Q. How would you characterize Biggs' conduct on the 29th of August with what you knew of him before?
"A. *180 degrees out.* There really is no comparison between what I saw that night and what I had known of him prior to that time.

"Q. Do you think he was drunk when he held the weapon?
"A. No, he didn't strike me that way, no.

"Q. Why not?
"A. Well, I've seen—I've seen all kinds of drunks, or I thought or I think I have, and I've seen fighting drunks, I've seen slobbering drunks, what-have you, but I haven't seen— I've never seen a drunk, if he was drunk, react that way. He was just very, very, very keyed-up and nervous and I don't think that is—I

don't associate that with drunks, even necessary for the most part.

"Q. Do you think he was scared?

"A. Very much so. That was predominant.

"Q. Do you have any reason to believe that PFC Biggs would voluntarily take drugs.

"A. No." [Emphasis supplied.]

Captain Frank N. Frazier stated that Biggs called him a " 'VC imposter.' " He also testified:

"Q. After you went into the orderly room what if anything did PFC Biggs say?

. . . . .

"A. He was frightened that the VC were going to get him. He was still under this impression. A couple of times he would come and go. He would start to get rational but he didn't know where he was, I don't think. He just acted like he was scared.

"Q. Did he appear to you to be intoxicated?

"A. I really wouldn't say he was intoxicated. I mean, so far as he didn't—he acted like somebody that was scared rather than—more than somebody that was intoxicated.

. . . . .

"Q. I have asked you this question. I will ask it again. Do you think he was intoxicated?

"A. *I have never seen an intoxicated man act like that.* That is I think he was—he may have had a drink. I have seen different people act different ways being intoxicated, certain degrees of intoxication, but whether he was intoxicated right at that point, he didn't act like it. He acted like a scared kid, anything like that. I don't know whether he —he just didn't act like a drunk to me. A drunk gets up and falls down and Tom didn't fall at any time I saw him down through there. It was very possible he may have been drinking.

. . . . .

"Q. *Do you think he recognized you outside?*

"A. *I don't think so.* I think he knew who I was or knew who Captain Frazier was supposed to be, but I don't think he thought that I was Captain Frazier.

"Q. Why do you say that?

"A. Because he kept calling me a VC imposter.

. . . . .

"Q. Would you compare his behavior the night of the 29th with that which you knew previously?

"A. No, it's *180 degrees different* from what Tom had ever done. I mean, he's been an ideal soldier as far as I was concerned. Never had any trouble with him, hard working. He came in one time and wanted me to talk to Major Gross and he wanted to be taken out as a crew chief. He wanted to be put in an ammo dump which I considered to be a worse task. He didn't want to be responsible for the lives of people. He didn't feel competent enough to do the job. He asked us to put him in the ammo dump and we had." [Emphasis supplied.]

*Private First Class Robert S. Salzer* (Stipulated Testimony, Defense Exhibit A).

"PFC Thomas Biggs has been on edge for the last month or so between the long hours and the Red Alerts. It's been too much for him. About 2330 hours, on 29 August 1970 PFC Biggs came back to the hootch. We talked to him for about an hour and he was jumping at the slightest noises. After he threw the sandwich [sic] at Sp. Straughn he walked over to the end of the hootch. Then he fell backward hitting the floor very hard with his head. He then was unconscious. We put him into bed. Then about 5 minutes later he regained consciousness his mind snapped. He thought everyone was a gook, as if we were Vietnamese. PFC Biggs told Capt Frazier that, 'I don't believe you are Captain Frazier.' PFC Biggs was O. K. until he hit his head. He was a different person after he hit his head."

I have taken the liberty of setting forth the rather lengthy quotes from the testimony of lay witnesses for the prosecution. After directing attention to that testimony, I am unable to perceive how it carries the Government's burden to prove the appellant's sanity.

Admittedly the testimony of these Government witnesses is not artful in the use of language to communicate opinions as to an accused's sanity as we often see the opinion testimony of psychiatrists; nevertheless, I find an abundance of testimony from the Government's own witnesses that the appellant's behavior was far from the normal. It strikes me that the use of the vernacular phrase, "180 degrees out of phase," fairly connotes the general view that the majority of the Government's witnesses believed appellant's conduct a vast departure from the normal. Such evidence is favorable to the defense contention that the evidence of sanity is insufficient.

The majority accurately relates that at times during the episode there was testimony that appellant identified by name First Sergeant Coffelt, Chief Warrant Officer Davis, Dr. Pearson, and Colonel Molinelli. The majority takes the position that this evidence tends to support the court's finding that the accused knew the military identity of the officers he assaulted; therefore, evidence of legal sanity. However, as I see it, quick reference to the evidence will indicate that the very officers assaulted all expressed the opinion that they did not believe the appellant recognized them when the assault took place. At best on the matter of recognition, the Government's evidence violently conflicts. Then does the testimony of the Government's two medical experts, coupled with its other evidence, lift the evidentiary burden high enough sufficiently to prove sanity? I do not believe so. Dr. Pearson, the squadron surgeon and not a psychiatrist, saw the appellant immediately after the assaults. Biggs was given 50 milligrams of thorazine because of his extreme agitation. I do not find any opinion expressed by Dr. Pearson regarding Biggs' sanity.

Dr. Char, the division psychiatrist, found nothing organically wrong and was unable to give an opinion concerning accused's mental condition. He stated:

"Q. On the basis of your discussion with him were you able to formulate opinions as to his probable condition at the time of the incident?

"A. Well, he related to me that he had no actual memory for the events and the only thing he could tell me about it is what other people had told him he had done. He did tell me he recalled drinking quite a bit previous to the incident.

"Q. Is there anything in your observation of him that would lead you to believe that he was not responsible at the time of the incident, from your observation?

"A. *Well, since he couldn't remember I really can't answer that question.* Since he couldn't remember what had happened to him *I couldn't answer that.*

"Q. Have you formulated any opinion as to why it is he may not have remembered?

"A. Well, to my mind the most *likely* explanation is that he had had too much alcohol to drink and this interfered with his ability to recall what had happened." [Emphasis supplied.]

On the other hand, the Government's medical witness who was on the scene provided testimony directly contrary to a theory that defendant had "too much alcohol." Dr. Pearson stated:

"Q. Did he appear to you to be inebriated at this time?

"A. No, he didn't. I don't believe so.

. . . . .

"Q. At the time you treated him, did you feel that—well, I will put it this way: did you feel that he was intoxicated?

"A. No, I didn't. I didn't feel he was intoxicated."

Turning now to the lay testimony from the witnesses for the prosecution on the matter of intoxication. Certainly there is evidence that the accused was drinking and exhibited some of the physical signs commonly associated with one under the influence of alcohol. Again, examination of the testimony of the Government's own witnesses and assuming its truth, the plurality of those witnesses opined that Biggs was *not* intoxicated.[1]

I fully recognize that the prosecution's evidence need not be so well orchestrated that it is without evidentiary conflicts. Indeed, it would be strange to find a case where multiple witnesses testify for the prosecution and there were no discernible conflicts. But when evidence is unsupportive of the Government's burden or so much in conflict that it offers only to the triers of fact an invitation to speculation, then it cannot be said that it provides a basis for a finding beyond a reasonable doubt by a reasonable mind. I believe the Government's evidence on the appellant's sanity suffer both infirmities.

I would **reverse**.

---

[1] Only in the opinion of Mr. Davis do I find an opinion based upon observation that Biggs could have been drunk. Mr. Davis testified that he thought it was "very possible" that the appellant was drunk. Lieutenant Merino stated that "you could tell he had been drinking."